## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| Joe Patterson,<br><br>     Plaintiff,<br><br>vs.<br><br>We Are Sharing Hope SC, United Network for Organ Sharing, Elizabeth Davies, M.D., Jacqueline Honig, M.D., and Darla Welker,<br><br>     Defendants. | Civil Action No: **2:21-cv-1242-BHH**<br><br>(Related Civil Action No: 2:20-mc-00471-BHH)<br><br><br>**COMPLAINT**<br>**(Jury Trial Demanded)** |

The Plaintiff, Joe Patterson, complaining of the Defendants as set forth herein, would respectfully show unto the Court and jury as follows:

### THE PARTIES

1.  The plaintiff, Joe Patterson ("Mr. Patterson"), is a citizen and resident of Tennessee.

2.  Defendant We Are Sharing Hope SC ("Sharing Hope") is an organ and tissue recovery service provider located in Charleston, South Carolina.

3.  Sharing Hope is the designated organ procurement organization ("OPO") for organ recovery services in South Carolina, and it provides organ and tissue donor services to numerous hospitals throughout South Carolina.

4.  Defendant Jacqueline Honig, M.D. ("Dr. Honig") is, and was during the relevant time, the Medical Director of Defendant Sharing Hope.

5.  Dr. Honig is a citizen and resident of Maryland.

6.  Defendant Darla Welker ("Ms. Welker") is, and was during the relevant time, an employee of Sharing Hope. Ms. Welker serves as an administrator on call at Sharing Hope, and

her duties and responsibilities in that capacity include overseeing, verifying, and approving the determination and reporting of donor blood types.

7.      Ms. Welker is a citizen and resident of South Carolina.

8.      Defendant United Network for Organ Sharing ("UNOS") is an organization with headquarters in Richmond, Virginia that manages and serves as the organ transplant system in the United States, which is known as the Organ Procurement and Transplantation Network ("OPTN"), under a contract with the federal government.

9.      According to UNOS's website, its responsibilities include, but are not limited to, "managing the national transplant waiting list," "matching donors to recipients," "maintaining the database that contains all organ transplant data for every transplant event that occurs in the U.S.," and "monitoring every organ match to ensure organ allocation policies are followed." https://unos.org/about/, last accessed April 22, 2021.

10.      UNOS advertises that it "provides a vital link in the organ transplant process" because "[i]ts policies and computerized network match donated organs with transplant candidates in ways that save as many lives as possible and provide transplant recipients with the best possible chance of long-term survival." https://unos.org/transplant/how-we-match-organs/, last accessed April 22, 2021. In fact, according to UNOS, "[e]very lifesaving organ transplant is managed through UNOS' computer system, which matches donors with potential transplant recipients 24 hours a day, 365 days a year." https://unos.org/about/, last accessed April 22, 2021.

11.      Defendant Elizabeth Davies, M.D. ("Dr. Davies") is, or was during the relevant time, a transplant surgeon employed by Vanderbilt University Medical Center ("Vanderbilt").

12.      Upon information and belief, Dr. Davies is a citizen and resident of Ohio.

## JURISDICTION, VENUE, AND PROCEDURAL BACKGROUND

13.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and the case is between citizens of different states.

14.    The Court has personal jurisdiction over Sharing Hope because Sharing Hope is located in South Carolina.

15.    The Court has personal jurisdiction over Dr. Honig because Mr. Patterson's claims against her arise out of her role as Medical Director of Sharing Hope, which is located in South Carolina. Specifically, Mr. Patterson's claims arise out of Dr. Honig's involvement, or lack thereof, in Sharing Hope's evaluation and management of potential organ donors and in the implementation and oversight of Sharing Hope's donor evaluation and management protocols, which ultimately led to Sharing Hope's wrongful distribution of a donor liver of the wrong blood type for transplantation into Mr. Patterson.

16.    The Court has personal jurisdiction over Ms. Welker because she is a citizen and resident of South Carolina.

17.    The Court has personal jurisdiction over UNOS because UNOS manages and serves as the one and only organ transplant system in the United States.  As the OPTN for the United States, UNOS, according to its own website, manages every organ transplant and monitors every organ match in the United States, including those involving South Carolina donors (such as the donor at issue in this case) and recipients, and matches organ donors and recipients, including those who are located in South Carolina (such as the donor at issue in this case).

18.     The Court has personal jurisdiction over Dr. Davies because Mr. Patterson's claims against her arise out of her participation in an organ procurement surgery in South Carolina during which she procured a donor liver for purposes of transplantation into Mr. Patterson.

19.     Venue is proper in this district because Defendant Sharing Hope is located in this district, Defendant Ms. Welker is a citizen and resident of this district, and a substantial part of the events giving rise to this action occurred in this district.

20.     Mr. Patterson filed a Notice of Intent to File Suit against Sharing Hope and UNOS, including a supporting expert affidavit, in this Court on October 22, 2020.  Mr. Patterson filed a Notice of Intent to File Suit against Dr. Davies, with a supporting expert affidavit, on February 22, 2021.  Mr. Patterson filed a Notice of Intent to File Suit, including supporting expert affidavit, against Dr. Honig and Ms. Welker, on March 18, 2021.

21.     The parties have participated in a pre-suit mediation conference in accordance with the requirements of S.C. Code § 15-79-125(C).

## STATEMENT OF THE FACTS

22.     Mr. Patterson's physicians at Vanderbilt determined that he was in need of a liver transplant and that he was a suitable candidate for a liver transplant, and they placed him on the transplant list.

23.     On November 24, 2018, the organ donor associated with donor identification number AFKY198 (the "Donor") was admitted to Grand Strand Medical Center (the "Donor Hospital") in Myrtle Beach, South Carolina as a trauma patient.

24.     The Donor underwent a massive blood transfusion protocol immediately upon arrival at the Donor Hospital and was declared dead on November 25, 2018.

25.     Sharing Hope was the OPO that oversaw and managed the Donor and the procurement and distribution of the Donor's organs, including the Donor's liver.

26.     As part of its responsibilities as the OPO for the Donor, Sharing Hope requested pre-transplant testing of the Donor's blood from VRL Eurofins ("VRL").  VRL tested two samples of the Donor's blood and transmitted reports of the test results to Sharing Hope.  Both reports listed the Donor's blood type as "indeterminate" and stated that the Donor's sample used for testing was collected post-transfusion.  The reports further stated that the forward and reverse blood types for the Donor were discrepant.  Specifically, the reports stated: "forward type is O negative and reverse is A."

27.     Sharing Hope obtained two other blood test results from the Donor Hospital.  Those blood test results were run on blood samples collected after the Donor, who was a trauma patient, received a massive amount of emergency blood transfusions.  They showed results of type O blood—the same blood type transfused into the Donor through a massive emergency blood transfusion protocol given as part of the Donor's treatment as a trauma patient.

28.     Despite the fact that the Donor's pre-transplant laboratory testing results from VRL reported that the Donor's blood type was indeterminate and discrepant, and despite the absence of any reliable ABO blood typing results for the Donor performed with samples collected before the Donor received massive emergency blood transfusions, Sharing Hope labeled the Donor as having type O blood.

29.     The only blood typing results for the Donor reporting type O blood were based on samples collected after the Donor received massive blood transfusions, and such results were, therefore, unreliable.

30.    Upon information and belief, Sharing Hope failed to investigate the cause of the indeterminate and discrepant blood typing results reported by VRL and failed to speak to VRL or the Donor Hospital about their blood typing results for the Donor.

31.    Ms. Welker served as WASH's administrator on call for the Donor's case.  In her role as administrator on call for the Donor's case, Ms. Welker participated in and oversaw the determination and reporting of the Donor's blood type, including verifying and approving the Donor's ABO blood typing results and the labeling of the Donor as having type O blood despite the pre-transplant laboratory results from VRL reporting the Donor's blood type as indeterminate and discrepant and despite the absence of any reliable ABO blood typing results for the Donor performed with samples collected before the Donor received massive emergency blood transfusions.

32.    Dr. Honig served as WASH's Medical Director during the relevant time period and was assigned to the Donor's case.  As Sharing Hope's Medical Director, Dr. Honig was responsible for assisting in the medical management of the Donor, ensuring that the Donor was thoroughly assessed for medical suitability for organ donation, and ensuring that potential donor evaluation and management protocols were implemented correctly for the Donor.

33.    Sharing Hope's Medical Director is required to be a South Carolina licensed physician pursuant to federal regulation 42 C.F.R. § 486.326(d) and Sharing Hope's own policies. Dr. Honig, however, was not licensed to practice medicine when serving as Sharing Hope's Medical Director during the relevant time period in November 2018, or for a substantial amount of time afterwards.  Dr. Honig did not become a South Carolina licensed physician until December 2020.

34.    UNOS reported the Donor's liver as available for transplant, listed the Donor as having type O blood, and matched Mr. Patterson with the Donor's liver.

35.    Mr. Patterson's physicians at Vanderbilt were offered the Donor's liver for Mr. Patterson, and they accepted it for transplantation into Mr. Patterson.

36.    Dr. Davies, in the course and scope of her employment with Vanderbilt as a transplant surgeon, traveled to the Donor Hospital in South Carolina, participated in the Donor's organ procurement surgery on November 27, 2018, at the Donor Hospital, and procured the Donor's liver for the purpose of transplantation into Mr. Patterson.

37.    While Dr. Davies was at the Donor Hospital procuring the Donor's liver, she signed a Pre-Recovery Verification stating that she verified the Donor's blood type was type O.  Dr. Davies also signed a High Risk Disclosure for the Donor while at the Donor Hospital, which stated that the Donor's risk of infection was unknown because a hemodiluted specimen was used for serological testing.

38.    As the surgeon who procured the Donor's liver for the purpose of transplantation into Mr. Patterson, Dr. Davies was responsible for verifying that the Donor's blood type was compatible with Mr. Patterson's blood type and that the Donor's liver was a match for Mr. Patterson.

39.    Later in the day on November 27, 2018, Mr. Patterson's physicians at Vanderbilt transplanted the Donor's liver, which had been procured by Dr. Davies, into Mr. Patterson.  Mr. Patterson began suffering serious complications soon after his transplant surgery, including, but not limited to, low hemoglobin levels, markedly elevated liver function tests, and acute renal failure.

40.    Mr. Patterson has type O blood.  It was determined shortly after the Donor's liver was transplanted into Mr. Patterson that the Donor actually had type A blood.

41.    Type A blood is incompatible with type O blood. Therefore, Mr. Patterson received an ABO incompatible donor liver.

42.    After the mistyping of the Donor's blood was discovered, Mr. Patterson's physicians at Vanderbilt initiated immunosuppression therapies in an attempt to make his body accept the Donor's ABO incompatible liver, but these therapies were unsuccessful.  Mr. Patterson remained critically ill and continued to suffer serious complications, including, but not limited to, acute renal failure, markedly elevated liver function tests, heart problems, hypotension, and respiratory failure.

43.    After several months of immunosuppression therapies, Mr. Patterson's condition continued to deteriorate, and his body rejected the Donor's ABO incompatible liver.

44.    Mr. Patterson's physicians at Vanderbilt determined that he was in need of a second liver transplant due to acute rejection of the Donor's ABO incompatible liver, and Mr. Patterson was placed on the transplant list again.

45.    Mr. Patterson underwent a second liver transplant at Vanderbilt with an ABO compatible liver on March 19, 2019.

46.    According to Mr. Patterson's medical records, the undisputed cause of his second liver transplant was acute rejection of his first liver transplant due to ABO incompatibility of the Donor's liver.

47.    By the time of his second transplant, Mr. Patterson's condition had deteriorated substantially due to the ABO incompatibility of the first transplant.  Mr. Patterson suffered, and continues to suffer, serious and life-threatening injuries as a result of his receipt of the Donor's

ABO incompatible liver.  Mr. Patterson's injuries include, but are not limited to, heart problems, kidney failure, biliary obstruction requiring the placement of biliary drains, elevated liver enzymes, pleural effusion, severe malnutrition requiring the placement of a feeding tube, severe anemia, uncontrolled diabetes resulting from the use of prescribed steroids, blood clots, and sepsis.  The full extent of Mr. Patterson's injuries resulting his ABO incompatible liver transplant are not yet known.

48.    If Mr. Patterson had received a donor liver of a blood type compatible with his blood type, he most likely would have successfully recovered from his first liver transplant, would not have required a second liver transplant, and would not have suffered the serious and ongoing injuries outlined above.

49.    Each of the Defendants, directly and vicariously through their agents, servants, contractors, and employees, failed to provide the requisite and adequate standard of care to Mr. Patterson and were negligent, reckless, willful, wanton, and grossly negligent in carrying out their duties and responsibilities in connection with the Donor and Mr. Patterson's liver transplant, as described in further detail in this Complaint.

50.    As a direct and proximate result of each of the Defendants' negligence, gross negligence, and failure to follow the recognized and generally accepted standards of care, Mr. Patterson suffered serious and life threatening injuries, which continue to this day, and incurred and continues to incur substantial damages and expenses as a result.

## FIRST CAUSE OF ACTION
### (Negligence/Gross Negligence/Recklessness by Sharing Hope)

51.    Mr. Patterson incorporates all prior paragraphs as if fully set forth herein.

52.    Sharing Hope holds itself out to the public as a competent and qualified OPO.

53.     At all times relevant to this action, Sharing Hope owed a duty to Mr. Patterson and others to provide competent and qualified services in the procurement, testing, evaluation, reporting, and distribution of organs for donation, including the Donor's liver that was transplanted into Mr. Patterson.

54.     As the OPO for the Donor's organs, Sharing Hope was responsible for accurately determining and reporting the Donor's blood type by testing at least two blood samples from the Donor drawn on separate occasions, having different collection times, and submitted as separate samples.  The two blood samples from the Donor were required to be collected before the Donor received emergency blood transfusions and to have results indicating the same blood type.

55.     Sharing Hope negligently and recklessly reported the Donor's liver as available for transplant, distributed the Donor's liver for transplant, and erroneously labeled the Donor as having type O blood despite the pre-transplant laboratory testing results performed by VRL at Sharing Hope's request, which reported that the Donor's blood type was indeterminate and discrepant, that the reverse blood typing for the Donor yielded results of type A blood, and that the blood samples used for the Donor's ABO typing were drawn after the Donor received emergency blood transfusions, and despite the absence of any reliable blood typing for the Donor performed with samples collected before the Donor received emergency blood transfusions.

56.     Sharing Hope failed to follow basic donor procedures in reporting the availability of and in distributing the Donor's liver transplanted into Mr. Patterson.

57.     Sharing Hope breached its duty of care to Mr. Patterson, deviated from the recognized and generally accepted standards of care, and was negligent, grossly negligent, and reckless in connection with its reporting the availability of and distributing the Donor's liver for transplant in the following separate and distinct ways:

a. By wrongfully reporting the availability of the Donor's liver for transplant despite the receipt of pre-transplant laboratory testing results from VRL reporting that the Donor's blood type was indeterminate and discrepant, that the reverse blood typing for the Donor yielded results of type A blood, and that the Donor's blood samples used for testing were drawn after the Donor received emergency blood transfusions;

b. By wrongfully reporting the availability of the Donor's liver for transplant without having two reliable ABO blood typing results for the Donor performed with samples collected before the Donor received emergency blood transfusions and indicating the same ABO blood type;

c. By wrongfully reporting the Donor as having type O blood despite pre-transplant laboratory testing results from VRL reporting that the Donor's blood type was indeterminate and discrepant, that the reverse blood typing for the Donor yielded results of type A blood, and despite the absence of reliable ABO blood typing for the Donor performed with samples collected before the Donor received emergency blood transfusions;

d. By distributing the Donor's liver for transplant despite the receipt of pre-transplant laboratory testing results from VRL reporting that the ABO blood type for the Donor was indeterminate and discrepant, that the reverse blood typing for the Donor yielded results of type A blood, and that the Donor's blood samples used for testing were drawn after the Donor received emergency blood transfusions;

e.  By distributing the Donor's liver for transplant without having two reliable ABO blood typing results for the Donor performed with samples collected before the Donor received emergency blood transfusions and indicating the same ABO blood type;

f.  By failing to recognize or ignoring that the samples used to perform ABO blood typing for the Donor were collected after the Donor received emergency blood transfusions, which made the Donor's ABO blood typing unreliable, as manifest by the indeterminate and discrepant ABO blood typing reported by VRL;

g.  By having a Medical Director who was not a South Carolina licensed physician in violation of both 42 C.F.R. § 486.326(d) and Sharing Hope's own policies; and

g.  Such other ways as might be proven at trial.

58.    Sharing Hope's deviations from the standard of care outlined above were each separate, distinct, and independent acts of negligence, gross negligence, and recklessness, each of which would have independently caused Mr. Patterson to receive an incompatible donor liver and to suffer the resulting injuries described herein.

59.    Sharing Hope's negligence, gross negligence, and recklessness proximately caused Mr. Patterson to receive a transplanted liver of an incompatible blood type and to suffer numerous serious and life-threatening injuries, many of which are ongoing, including, but not limited to, hyperacute rejection of the Donor's ABO incompatible liver, the need to undergo a second liver transplant, heart problems, kidney failure, biliary obstruction requiring the placement of biliary drains, elevated liver enzymes, pleural effusion, severe malnutrition requiring the placement of a feeding tube, severe anemia, uncontrolled diabetes resulting from the use of prescribed steroids,

blood clots, and sepsis. The full extent of Mr. Patterson's injuries resulting from Sharing Hope's negligence, gross negligence, and recklessness is not yet known.

60.     Mr. Patterson has incurred and continues to incur substantial damages and expenses as a result of Sharing Hope's negligence, gross negligence, and recklessness, including, but not limited to, past medical costs related to his two liver transplants and resulting injuries, anticipated future medical costs, emotional distress, pain and suffering, and loss of enjoyment of life.

61.     Mr. Patterson is entitled to recover from Sharing Hope all direct, consequential, punitive, and special damages incurred as a result of Mr. Patterson's injuries in an amount to be determined by a jury.

## SECOND CAUSE OF ACTION
### (Negligence/Gross Negligence/Recklessness by Dr. Honig)

62.     Mr. Patterson incorporates all prior paragraphs as if fully set forth herein.

63.     As Sharing Hope's Medical Director, Dr. Honig is, and was during all relevant times, responsible for implementation of Sharing Hope's protocols for donor evaluation and management and for overseeing the clinical management of potential donors pursuant to 42 C.F.R. § 486.326(d). Dr. Honig is, and was during all relevant times, further responsible for ensuring that potential donors are thoroughly assessed for medical suitability for organ donation pursuant to 42 C.F.R. § 486.344(a)(1).

64.     Sharing Hope's written policies further required Dr. Honig, as the Medical Director of Sharing Hope during all relevant times, to ensure that potential donor evaluation and management protocols were implemented correctly, that potential donors were thoroughly assessed for medical suitability for organ donation, and to assist in the medical management of potential donors.

65.    Dr. Honig has a duty to Mr. Patterson and others to provide competent and qualified services as Sharing Hope's Medical Director, including in connection with the Donor whose liver Mr. Patterson received.

66.    The United States Department of Health and Human Services Centers for Medicare & Medicaid Services ("CMS") issued a Statement of Deficiencies and Plan of Correction regarding Sharing Hope following a complaint survey conducted at Sharing Hope on May 8-9, 2019.  A copy of the Statement of Deficiencies and Plan of Correction is attached as Exhibit A.

67.    CMS determined that Sharing Hope violated 42 C.F.R. § 486.326(d) because it failed to have a policy, procedure, or protocol regarding discrepancies in donor blood type test results.  CMS also determined that Sharing Hope violated 42 C.F.R. § 486.344(a)(1) because it failed to ensure that all donor records were reviewed by the Medical Director, and the Medical Director admitted in an interview with CMS that she had not been reviewing all donor records.

68.    Dr. Honig negligently and recklessly failed to ensure that donor evaluation and management protocols for the Donor were implemented correctly; to provide adequate oversight of the clinical management of the Donor; to ensure that the Donor was thoroughly and appropriately assessed for medical suitability for organ donation; to review the Donor's records; and to adequately assist in the management of the Donor.

69.    Dr. Honig breached her duty of care to Mr. Patterson, deviated from the recognized and generally accepted standards of care, and was negligent, grossly negligent, and reckless in in connection with her involvement, or lack thereof, in the Donor's evaluation and management, in the following separate and distinct ways:

        a.    By failing to ensure that Sharing Hope had an adequate policy, procedure, or protocol regarding discrepancies in donor blood type test results;

b.  By failing to ensure that Sharing Hope follow the policy it did have regarding discrepant donor blood typing results;

c.  By failing to review the Donor's records or to ensure that they were reviewed by Sharing Hope's Associate Medical Director;

d.  By failing to recognize or ignoring the fact that the samples used to perform ABO blood typing for the Donor were collected after the Donor received emergency blood transfusions, which made the Donor's ABO blood typing results unreliable;

e.  By failing to recognize or ignoring the fact that pre-transplant laboratory testing results from VRL reported that the Donor's blood type was indeterminate and discrepant;

f.  By permitting the Donor to be reported as having type O blood despite pre-transplant laboratory testing results from VRL reporting that the Donor's blood type was indeterminate and discrepant, that the reverse blood typing for the Donor yielded results of type A blood, and despite the absence of reliable ABO blood typing results for the Donor performed with samples collected before the Donor received massive emergency blood transfusions;

g.  By permitting the Donor's liver to be reported as available for transplant and to be distributed despite pre-transplant laboratory testing results from VRL reporting that the Donor's blood type was indeterminate and discrepant, that the reverse blood typing for the Donor yielded results of type A blood, and despite the absence of reliable ABO blood typing results for the Donor performed with

samples collected before the Donor received massive emergency blood transfusions;

h.   By failing to adequately supervise and assist in the management of the Donor;

i.   By failing to ensure that the Donor was thoroughly and appropriately assessed for medical suitability for organ donation;

j.   By serving as Sharing Hope's Medical Director without being a South Carolina licensed physician in violation of both 42 C.F.R. § 486.326(d) and Sharing Hope's own policies; and

k.   Such other ways as might be proven at trial.

70.   Dr. Honig's deviations from the standard of care outlined above were each separate, distinct, and independent acts of negligence and gross negligence, each of which would have independently caused Mr. Patterson to receive an incompatible donor liver and to suffer the resulting injuries described herein.

71.   Dr. Honig's negligence, gross negligence, and recklessness proximately caused Mr. Patterson to receive a transplanted liver of an incompatible blood type and to suffer numerous serious and life-threatening injuries, many of which are ongoing, including, but not limited to, hyperacute rejection of the Donor's ABO incompatible liver, the need to undergo a second liver transplant, heart problems, kidney failure, biliary obstruction requiring the placement of biliary drains, elevated liver enzymes, pleural effusion, severe malnutrition requiring the placement of a feeding tube, severe anemia, uncontrolled diabetes resulting from the use of prescribed steroids, blood clots, and sepsis.  The full extent of Mr. Patterson's injuries resulting from Sharing Hope's negligence, gross negligence, and recklessness is not yet known.

72.    Mr. Patterson has incurred and continues to incur substantial damages and expenses as a result of Dr. Honig's negligence, gross negligence, and recklessness, including, but not limited to, past medical costs related to his two liver transplants and resulting injuries, anticipated future medical costs, emotional distress, pain and suffering, and loss of enjoyment of life.

73.    Mr. Patterson is entitled to recover from Dr. Honig all direct, consequential, punitive, and special damages incurred as a result of Mr. Patterson's injuries in an amount to be determined by a jury.

### THIRD CAUSE OF ACTION
**(Negligence/Gross Negligence/Recklessness by Ms. Welker)**

74.    Mr. Patterson incorporates all prior paragraphs as if fully set forth herein.

75.    Ms. Welker served as Sharing Hope's administrator on call for the Donor's case.

76.    In her role as administrator on call for the Donor's case, Ms. Welker participated in and oversaw the determination and reporting of the Donor's blood type, including verifying and approving the Donor's ABO blood typing results and the labeling of the Donor as having type O blood.

77.    Ms. Welker has a duty to Mr. Patterson and others to provide competent and qualified services as an administrator on call for Sharing Hope, including in connection with the Donor whose liver Mr. Patterson received.

78.    Ms. Welker was negligent, grossly negligent, and reckless in verifying and approving the labeling of the Donor as having type O blood despite the pre-transplant laboratory results from VRL reporting that the Donor's blood type was indeterminate and discrepant, that the reverse blood typing for the Donor yielded results of type A blood, and despite the absence of reliable ABO blood typing results for the Donor performed with samples collected before the Donor received massive emergency blood transfusions.

79.    Ms. Welker breached her duty of care to Mr. Patterson, deviated from the recognized and generally accepted standards of care, and was negligent, grossly negligent, and reckless in connection with her involvement with the determination and reporting of the Donor's blood type in the following separate and distinct ways:

    a.    By verifying and approving the determination of the Donor's blood type based on ABO blood testing results of samples collected from the Donor after the Donor received massive emergency blood transfusions, which made the Donor's ABO blood typing results unreliable;

    b.    By ignoring the fact that pre-transplant laboratory testing results from VRL reported that the Donor's blood type was indeterminate and discrepant;

    c.    By failing to investigate and to determine the cause of the indeterminate and discrepant blood typing results issued for the Donor by VRL as required by Sharing Hope's policies;

    d.    By verifying and approving the labeling of the Donor as having type O blood despite pre-transplant laboratory testing results from VRL reporting that the Donor's blood type was indeterminate and despite the absence of reliable ABO blood typing results for the Donor performed with samples collected before the Donor received massive emergency blood transfusions; and

    e.    Such other ways as might be proven at trial.

80.    Ms. Welker's deviations from the standard of care outlined above were each separate, distinct, and independent acts of negligence and gross negligence, each of which would have independently caused Mr. Patterson to receive an incompatible donor liver and to suffer the resulting injuries described herein.

81.     Ms. Welker's negligence, gross negligence, and recklessness proximately caused Mr. Patterson to receive a transplanted liver of an incompatible blood type and to suffer numerous serious and life-threatening injuries, many of which are ongoing, including, but not limited to, hyperacute rejection of the Donor's ABO incompatible liver, the need to undergo a second liver transplant, heart problems, kidney failure, biliary obstruction requiring the placement of biliary drains, elevated liver enzymes, pleural effusion, severe malnutrition requiring the placement of a feeding tube, severe anemia, uncontrolled diabetes resulting from the use of prescribed steroids, blood clots, and sepsis.  The full extent of Mr. Patterson's injuries resulting from Sharing Hope's negligence, gross negligence, and recklessness is not yet known.

82.     Mr. Patterson has incurred and continues to incur substantial damages and expenses as a result of Ms. Welker's negligence, gross negligence, and recklessness, including, but not limited to, past medical costs related to his two liver transplants and resulting injuries, anticipated future medical costs, emotional distress, pain and suffering, and loss of enjoyment of life.

83.     Mr. Patterson is entitled to recover from Ms. Welker all direct, consequential, punitive, and special damages incurred as a result of Mr. Patterson's injuries in an amount to be determined by a jury.

### FOURTH CAUSE OF ACTION
**(Negligence/Gross Negligence/Recklessness by UNOS)**

84.     Mr. Patterson incorporates all prior paragraphs as if fully set forth herein.

85.     UNOS holds itself out to the public as a competent and qualified manager of the organ transplant system in the United States and provider of services related to the organ transplant and donation system and process in the United States.

86.     At all times relevant to this action, UNOS owed a duty to Mr. Patterson and others to provide competent and qualified services in connection with its management of the country's

organ transplant system and its provision of services for the organ transplant and donation system and process in the United States, including in reporting the Donor's liver as available for transplant and in matching Mr. Patterson with the Donor's liver.

87.     UNOS breached its duty of care to Mr. Patterson, deviated from the recognized and generally accepted standards of care, and was negligent, grossly negligent, and reckless in connection with its reporting the availability of the Donor's liver for transplant and matching of Mr. Patterson with the Donor's liver in the following separate and distinct ways:

a.  By wrongfully reporting the Donor's liver as available for transplant despite pre-transplant laboratory testing results from VRL reporting that the Donor's blood type was indeterminate and discrepant, that the reverse blood typing for the Donor yielded results of type A blood, and that the Donor's blood samples used for testing were drawn after the Donor received emergency blood transfusions;

b.  By wrongfully reporting the availability of the Donor's liver for transplant without having two reliable ABO blood typing results for the Donor performed with samples collected before the Donor received emergency blood transfusions and indicating the same ABO blood type;

c.  By failing to recognize or ignoring that the samples used to perform ABO blood typing for the Donor were collected after the Donor received emergency blood transfusions, which made the Donor's ABO blood typing unreliable, as manifest by the indeterminate ABO blood typing reported by VRL;

d.  By wrongfully labeling the Donor as having type O blood despite pre-transplant laboratory testing results from VRL reporting that the Donor's blood type was

indeterminate and discrepant, that the reverse blood typing for the Donor yielded results of type A blood, and despite the absence of reliable ABO blood typing for the Donor performed with samples collected before the Donor received emergency blood transfusions and indicating the same ABO blood type;

e. By wrongfully matching Mr. Patterson with the Donor's liver despite pre-transplant laboratory testing results from VRL reporting that the Donor's blood type was indeterminate and discrepant, that the reverse blood typing for the Donor yielded results of type A blood, and despite the absence of reliable ABO blood typing for the Donor performed with samples collected before the Donor received emergency blood transfusions and indicating the same ABO blood type;

f. By permitting Sharing Hope to be a member of the OPTN when its Medical Director was not a South Carolina licensed physician as required by 42 C.F.R. § 486.326(d); and

g. Such other ways as might be provide at trial.

88.    UNOS' deviations from the standard of care outlined above were each separate, distinct, and independent acts of negligence and gross negligence, each of which would have independently caused Mr. Patterson to receive an incompatible donor liver and to suffer the resulting injuries described herein.

89.    UNOS' negligence, gross negligence, and recklessness proximately caused Mr. Patterson to receive a transplanted liver of an incompatible blood type and to suffer numerous serious and life-threatening injuries, many of which are ongoing, including, but not limited to,

hyperacute rejection of the Donor's ABO incompatible liver, the need to undergo a second liver transplant, heart problems, kidney failure, biliary obstruction requiring the placement of biliary drains, elevated liver enzymes, pleural effusion, severe malnutrition requiring the placement of a feeding tube, severe anemia, uncontrolled diabetes resulting from the use of prescribed steroids, blood clots, and sepsis.  The full extent of Mr. Patterson's injuries resulting from Sharing Hope's negligence, gross negligence, and recklessness is not yet known.

90.    Mr. Patterson has incurred and continues to incur substantial damages and expenses as a result of UNOS' negligence, gross negligence, and recklessness, including, but not limited to, past medical costs related to his two liver transplants and resulting injuries, anticipated future medical costs, emotional distress, pain and suffering, and loss of enjoyment of life.

91.    Mr. Patterson is entitled to recover from UNOS all direct, consequential, punitive, and special damages incurred as a result of Mr. Patterson's injuries in an amount to be determined by a jury.

**FIFTH CAUSE OF ACTION**
**(Negligence/Gross Negligence/Recklessness by Dr. Davies)**

92.    Mr. Patterson incorporates all prior paragraphs as if fully set forth herein.

93.    As the surgeon who procured the Donor's liver for the purpose of transplantation into Mr. Patterson, Dr. Davies owed a duty to Mr. Patterson to accurately verify that the Donor's blood type was compatible with Mr. Patterson's blood type and that the Donor's liver was a match for Mr. Patterson.  This duty included a duty to check the available blood typing results for the Donor and the Donor's medical record available on DonorNet and at the Donor Hospital to confirm that the Donor's blood typing was determined by testing two samples collected before the Donor received massive blood transfusions and was reliable.

94.    Dr. Davies breached her duty of care to Mr. Patterson, deviated from the recognized and generally accepted standards of care, and was negligent, grossly negligent, and reckless in connection with her reporting the availability of and distributing the Donor's liver for transplant in the following separate and distinct ways:

a.  By failing to accurately verify that the Donor's blood type was compatible with Mr. Patterson's blood type;

b.  By failing to accurately verify that the Donor's liver was a match for Patterson;

c.  By wrongfully accepting the Donor's liver for transplantation into Mr. Patterson, which was ABO incompatible with Mr. Patterson;

d.  By ignoring the pre-transplant testing reports for the Donor issued by VRL reporting that the Donor's blood type was indeterminate, that the forward and reverse blood types were discrepant, that the reverse typing yielded type A results, and that the samples tested were collected post-transfusion;

e.  By failing to recognize or ignoring that the only blood typing results for the Donor indicating type O blood were unreliable because they were based on samples collected after the Donor received massive emergency blood transfusions;

f.  By failing to recognize or ignoring information in the Donor's medical record revealing that the Donor was a trauma patient who underwent a massive transfusion protocol immediately upon arrival at the Donor Hospital, which should have cast further doubt on the accuracy of the blood type reported for the Donor;

g.  By failing to verify that the Donor's blood typing was determined by testing two samples collected before the Donor received massive blood transfusions;

h.  By signing a Pre-Recovery Verification stating that she verified the Donor's ABO was type O despite the pre-transplant testing reports issued by VRL reporting that the Donor's blood type was indeterminate and discrepant and despite the lack of any reliable blood typing results for the Donor indicating type O blood based on samples collected before the Donor received massive emergency blood transfusions; and

i.  Such other ways as might be proven at trial.

95.    Dr. Davies' deviations from the standard of care outlined above were each separate, distinct, and independent acts of negligence and gross negligence, each of which would have independently caused Mr. Patterson to receive an incompatible donor liver and to suffer the resulting injuries described herein.

96.    Dr. Davies' negligence, gross negligence, and recklessness proximately caused Mr. Patterson to receive a transplanted liver of an incompatible blood type and to suffer many serious and life-threatening injuries, many of which are ongoing, including, but not limited to, hyperacute rejection of the Donor's ABO incompatible liver, the need to undergo a second liver transplant, heart problems, kidney failure, biliary obstruction requiring the placement of biliary drains, elevated liver enzymes, pleural effusion, severe malnutrition requiring the placement of a feeding tube, severe anemia, uncontrolled diabetes resulting from the use of prescribed steroids, blood clots, and sepsis.  The full extent of Mr. Patterson's injuries resulting from Sharing Hope's negligence, gross negligence, and recklessness is not yet known.

97.    Mr. Patterson has incurred and continues to incur substantial damages and expenses as a result of Dr. Davies' negligence, gross negligence, and recklessness, including, but not limited

to, past medical costs related to his two liver transplants and resulting injuries, anticipated future medical costs, emotional distress, pain and suffering, and loss of enjoyment of life.

98.    Mr. Patterson is entitled to recover from Dr. Davies all direct, consequential, punitive, and special damages incurred as a result of Mr. Patterson's injuries in an amount to be determined by a jury.

## REQUEST FOR RELIEF

99.    Mr. Patterson incorporates all prior paragraphs as if fully set forth herein.

100.    As a direct and proximate result of the wrongful conduct of each of the Defendants described above, Mr. Patterson requests judgment against each of the Defendants, jointly and severally, for the following:

      a.  All direct, consequential, punitive, and special damages in an amount to be determined by a jury;

      b.  Reasonable attorney's fees and costs; and

      c.  Any other such relief the Court deems just and proper.

## JURY TRIAL DEMAND

101.    A trial by jury is demanded as to all issues to the extent permitted by law.

Respectfully submitted,

Wyche, P.A.

*s/John C. Moylan, III*
John C. Moylan, III (U.S.D.C. Fed I.D. 5431)
Lucy Dinkins (U.S.D.C. Fed I.D. 11961)
807 Gervais Street, Suite 301
Columbia, South Carolina 29201
Telephone:  803-254-6542; Fax:  803-254-6544
Email:  jmoylan@wyche.com;
ldinkins@wyche.com

April 26, 2021                    *Attorneys for Plaintiff*