# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

| | |
|---|---|
| Aaliyah Patterson, Administratrix for the Estate of Joe Patterson,<br><br>    Plaintiff,<br><br>vs.<br><br>We Are Sharing Hope SC, United Network for Organ Sharing, and Elizabeth Davies, MD, Jacqueline Honig, MD and Darla Welker,<br><br>    Defendants. | Civil Action No. 2:21-cv-1242-BHH<br><br><br>**MEMORANDUM IN SUPPORT OF DEFENDANT UNITED NETWORK FOR ORGAN SHARING'S MOTION FOR SUMMARY JUDGMENT** |

Defendant United Network for Organ Sharing ("UNOS") (hereafter, "Defendant") submits this memorandum and attached exhibits in support of its motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Simply stated, there is no evidence that any of Joe Patterson's alleged injuries and death were proximately caused by any act or omission of Defendant. Accordingly, Defendant respectfully submits that it is entitled to summary judgment with respect to all of Plaintiff's claims as to Defendant and dismissal of Defendant with prejudice.

## I. FACTUAL BACKGROUND

Plaintiff Joe Patterson's physicians at Vanderbilt University Medical Center determined Plaintiff needed a liver transplant, found him a suitable transplant candidate, and placed him on the national transplant waiting list. (Compl. ¶ 22). Plaintiff has type O Blood. (Compl. ¶ 41). On November 24, 2018, an organ donor with identification number AFKY198 (the "Donor") was admitted to Grand Strand Medical Center (the "Donor Hospital") in Myrtle Beach, South Carolina as a trauma patient and immediately underwent an emergency blood transfusion with type O blood. (Compl. ¶¶ 23, 24, 27). The next day, the Donor was declared dead. (Compl. ¶ 24).

As alleged by Plaintiff, after the Donor passed, WASH, as the OPO for South Carolina, oversaw and managed the Donor and the procurement and distribution of the Donor's organs, including the liver. (Compl. ¶ 25). WASH requested pre-transplant testing of the Donor's blood from VRL Eurofins ("VRL"), which tested two samples of the Donor's blood and provided reports to WASH. (Compl. ¶ 26). The reports listed the Donor's blood type as "indeterminate," noted the tested samples were collected post-transfusion, and stated "forward type is O negative and reverse type is A." (Compl. ¶ 26)). WASH obtained two other blood test results from samples collected by the Donor Hospital after the Donor received the blood transfusion. (Compl. ¶ 27). The Donor Hospital's blood bank certified the results of that blood typing showing the Donor was type O blood. (Compl. ¶ 27).

With this information in its possession, WASH labeled the Donor as having type O blood based on the information provided to it by the hospital blood bank. (Compl. ¶ 28). Plaintiff alleges the results WASH relied on in labeling the Donor with type O blood were unreliable because they were based on samples collected after the Donor's transfusion with type O blood. (Compl. ¶ 29). Plaintiff asserts a cause of action styled "negligence/gross negligence/recklessness" against WASH, alleging WASH owed Plaintiff a duty to provide competent and qualified services in the procurement, testing, evaluation, reporting, and distribution of the Donor's liver transplanted into Plaintiff. (Compl. ¶¶ 51–61).

Plaintiff alleges Welker served as WASH's administrator on call for the Donor's case. (Compl. ¶ 31). In this role, it is alleged she participated in and oversaw the determination and reporting of the Donor's blood type, including verifying and approving the Donor's blood typing results and labeling the Donor as having type O blood. (Compl. ¶ 31).

Plaintiff alleges Honig served as WASH's medical director during the relevant time period and was assigned to the Donor's case. (Compl. ¶ 32). In this position, it is alleged that Honig was responsible for assisting in the medical management of the Donor, ensuring the Donor was assessed for medical suitability for organ donation, and ensuring that potential donor evaluation and management protocols were correctly implemented. (Compl. ¶ 32). Plaintiff further alleges Honig was not a South Carolina licensed physician until December 2020. (Compl. ¶ 33).

Plaintiff alleges Davies is a transplant surgeon employed by Vanderbilt who traveled to the Donor Hospital in South Carolina on November 27, 2018, to participate in the Donor's organ procurement surgery and procured the Donor's liver to transplant into Plaintiff. (Compl. ¶ 36). At the Donor Hospital, Davies signed a Pre-Recovery Verification stating that she verified the Donor's blood type was O. (Compl. ¶ 37). Plaintiff asserts that Davies was responsible for verifying that the Donor's blood type was compatible with Plaintiff's and that he Donor's liver suited Plaintiff. (Compl. ¶ 38).

On November 27, 2018, Plaintiff's physicians at Vanderbilt transplanted the Donor's liver into Plaintiff. (Compl. ¶ 39). Shortly thereafter, Plaintiff began suffering complications. (Compl. ¶ 39). It was also determined that the Donor actually had type A blood, which is incompatible with Plaintiff's type O blood. (Compl. ¶¶ 40, 41). Plaintiff began immunosuppression therapies, but his body ultimately rejected the Donor's liver. (Compl. ¶ 42, 43). On March 29, 1019, Plaintiff underwent a second liver transplant with an ABO compatible liver. (Compl. ¶ 45). Plaintiff Joe Patterson continued to suffer complications and passed away on December 27, 2021.

UNOS is a Virginia non-profit membership corporation located in Richmond, Virginia that manages and serves as country's Organ Procurement and Transplantation Network (the "OPTN"), under a contract with the federal government. (Compl. ¶ 8). Plaintiff further alleges UNOS

3

reported the Donor's liver as available for transplant, listed the Donor as having type O blood, and matched Patterson with the Donor's liver. (Compl. ¶ 34). However, Plaintiff alleges WASH, specifically WASH's administrator on call, Darla Welker—not UNOS—evaluated the suitability of the heart for transplant, listed the Donor as having type O blood in the UNOS system, and distributed the heart for transplant to Defendant Atrium. (Compl. ¶ 31). Specifically, WASH was the entity responsible for determining the Donor's blood type by testing at least two blood samples from the Donor indicating a blood-type match. (Compl. ¶ 24). Plaintiff also alleges WASH ordered pre-transplant blood testing for the Donor from nonparty VRL Eurofins, who issued two final pre-transplant testing reports to WASH allegedly showing the Donor's blood type was indeterminate and discrepant, as the forward typing for the Donor's blood yielded type O results while the reverse yielded type A results. (Compl. ¶ 26). Plaintiff further alleges that WASH obtained two other blood test results from the Donor Hospital after the Donor had received a massive amount of emergency blood transfusions with type O blood. (Compl. ¶ 27). Subsequent to receipt of the discrepant and indeterminate blood typing results, Plaintiff alleges that WASH labeled the Donor as having type O blood and input that data into the UNOS computer system. (Compl. ¶¶ 28–34).

According to UNOS's website, and the testimony elicited in the voluminous discovery conducted in this matter, when a transplant hospital accepts a person as a transplant candidate, the hospital enters medical data—such as the person's blood type, medical urgency, and location of the transplant hospital—about that candidate into UNOS's computerized network. See https://unos.org/transplant/how-we-match-organs/ (last accessed March 17, 2023). When an OPO obtains consent for an organ donor, the OPO enters medical data—such as the donor's blood type, body size, and location of the donor hospital—into UNOS's network. Id. Using the combination of donor and candidate information, the UNOS computer system generates a "match run"—a rank-

order list of candidates to be offered each organ—where candidates in the most urgent need of the transplant and/or those most likely to have the best chance of survival if implanted are ranked highest. Id.

There is no allegation that UNOS had any involvement whatsoever with ABO blood typing of donors or organ recipients—UNOS does not test blood types, verify blood type reports or test, or enter the medical data into UNOS's network, nor is it responsible for doing so. There is no allegation that UNOS was responsible for or knew or should have known about the VRL Eurofins reports, which were ordered and received by WASH. (See Compl ¶ 26). Plaintiff alleges it is the result of WASH's actions or omissions in failing to determine the Donor's blood type and wrongfully reporting the blood type of the Donor's heart that resulted in Patterson's mismatched organ. (Compl. ¶¶ 51–61). UNOS operates an interactive computer system that relied on the information that was input by WASH which subsequently showed the liver was offered by WASH to Vanderbilt University Medical Center for transplant in Patterson. Dr. Davies and Vanderbilt University Medical Center also utilize the same system to review documentation uploaded by WASH in determining the liver was appropriate for transplant into Patterson. As such, UNOS's involvement is limited to making available information provided by other parties. It simply provides the mechanism for matching up donors and organ recipients based on the information entered into its computer system by the OPO and the transplant teams.

Secondarily, Plaintiff also alleges that UNOS wrongfully permitted WASH to be a member of its OPTN because its medical director, Dr. Honig, was not a licensed South Carolina physician at the time of this event. (Compl. ¶ 87). However, discovery has proven that Dr. Honig was not reported to the OPTN as the Medical Director of WASH at the time of this event and that WASH had an appropriately licensed South Carolina physician as its medical director. Notwithstanding

the plaintiff's plainly erroneous factual allegation about the WASH Medical Director, federal regulations *require* the OPTN to admit and retain as member all federally designated organ procurement organizations, including WASH. 42 C.F.R. §121.3(b)(1)(i).

## PROCEDURAL HISTORY

On April 26, 2021, Plaintiff initiated this action by filing a complaint on the basis of diversity jurisdiction. (ECF No. 1). Counsel for UNOS accepted service of process on May 7, 2021. (ECF No. 14). On May 27, 2021, Plaintiff granted UNOS a fourteen-day extension to June 11, 2021 for filing an answer, motion, or other responsive pleading. (ECF No. 19). On June 11, 2021, UNOS filed a motion to dismiss Plaintiff's cause of action against UNOS with its answer to Plaintiff's Complaint on the basis of UNOS's immunity under the Anatomical Gifts Acts of South Carolina and Virginia, and on the basis that Plaintiff failed to establish and facts showing UNOS owed Plaintiff a duty. (ECF Nos. 27, 28). UNOS's motion was denied on the basis that the legal question of whether UNOS owed a duty to Plaintiff is better raised after the parties have had the benefit of discovery, which has now occurred. (ECF No. 67). The issue regarding UNOS's immunity under the Anatomical Gifts Acts of South Carolina and Virginia has been preserved according to the Court's clarification and is now ripe for determination following discovery. (ECF No. 109).

## LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); see Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The moving party has the burden of showing—"that is, pointing out to the district

court—that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. Once the moving party makes this showing, the opposing party must "go beyond the pleadings" to evince "specific facts showing . . . a genuine issue for trial." Id. at 324. A genuine issue of material fact—one "that might affect the outcome of the suit under the governing law"—exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Anderson, 477 U.S. at 248. The nonmoving party is required to submit evidence of specific facts by way of affidavits, depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. Celotex, 477 U.S. at 322. However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247–48.

The Court should determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251–52. The Court should not grant summary judgment "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." Campbell v. Hewitt, Coleman & Assocs, Inc., 21 F.3d 52, 55 (4th Cir. 1994) (citation omitted). In ruling on a motion for summary judgment, the Court must not resolve disputed facts, weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995) (citation omitted), or make determinations of credibility. Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam).

## DISCUSSION

I.    **UNOS Is Entitled To Summary Judgment As A Matter Of Law, Because Plaintiff Lacks The Requisite Expert Testimony To Establish The Applicable Standard of Care, Breach of the Standard of Care, and Proximate Cause As It Relates to UNOS.**

To prove a negligence cause of action under South Carolina law, a plaintiff must show:  (1) a legal duty owed by the defendant to the plaintiff; (2) a breach of that duty by a negligent act or omission; (3) the breach was the actual and proximate cause of the plaintiff's injury; and (4) damages sustain by the plaintiff.[1]  Andrade v. Johnson, 356 S.C. 238, 245, 588 S.E.2d 588, 592 (2003) (citation omitted). "Negligence is not actionable unless it is the proximate cause of the injuries, and it may be deemed a proximate cause only when without such negligence the injury would not have occurred or could have been avoided." Heard v. Roper Hosp., Inc., 387 S.C. 539, 547, 694 S.E.2d 1, 5 (2010) (affirming entry of summary judgment in a medical malpractice action where the causation evidence presented by the plaintiff was merely a "speculative hypothetical").

In a medical malpractice case, expert testimony that the "injuries complained of most probably resulted from the defendant's negligence," is required to meet a plaintiff's burden of proving proximate cause. Ellis by Ellis v. Oliver, 323 S.C. 121, 125 473 S.E.2d 793, 795 (1996); see also David v. McLeod Regl. Med. Ctr., 367 S.C. 242, 249, 626 S.E.2d 1, 4 (2006) ("In South Carolina, medical malpractice actions require a greater showing than generic allegations and conjecture."). As explained by the South Carolina Supreme Court,

> The reason for this rule is the highly technical nature of malpractice litigation. Since many malpractice suits involve ailments and treatments outside of the realm of ordinary lay knowledge, expert testimony is generally necessary. When it is the only evidence of proximate cause relied upon, it must provide a **significant causal**

---

[1]    The Court's jurisdiction is premised on complete diversity of the parties; therefore, South Carolina substantive law should apply.  See Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., Inc., 386 F.3d 581, 599–600 (4th Cir. 2004) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 79 (1938)) ("A federal court exercising diversity jurisdiction is obliged to apply the substantive law of the state in which it sits . . . .").  The Federal Rules of Evidence still apply.  Fed. R. Evid. 101(a), 1101.

> **link** between the alleged negligence and the plaintiff's injuries, **rather than a tenuous and hypothetical connection**.

Ellis at 125, 473 S.E.2d at 795 (emphasis added). Moreover,

> It **is not sufficient for the expert** . . . to testify **that the ailment might or could have resulted from the alleged cause**. He must go further and testify that taking into consideration all the data it is his professional opinion that the result in question most probably came from the cause alleged.

Baughman v. AT&T, 306 S.C. 101, 111, 410 S.E.2d 537, 543 (1991). While the expert need not actually use the words "most probably" the testimony must "judicially impress that the opinion ... represents his professional judgment as to the most likely one among possible causes." And an opinion "within the realm of possibility only" is not sufficient. Id.

In the course of discovery in this matter, Plaintiff identified five experts whom they expected would offer opinions establishing the standard of care as applicable to UNOS and proximate cause as it relates to UNOS and the blood typing mismatch and resulting organ mismatching; however, none of these experts have offered a professional opinion as to UNOS's involvement in this matter. No expert has opined as to what UNOS's applicable standard of care is in this matter and no expert has opined that UNOS breached the standard of care. Additionally, none of Plaintiff's five experts offered any expert testimony that any action or inaction by UNOS contributed to the harm alleged in this matter. Consequently, no expert has opined that any action or inaction by UNOS was the proximate cause of the harm alleged in this matter. Accordingly, Plaintiff lacks the requisite expert testimony to establish that Defendant UNOS breached any applicable standard of care or that any alleged breach of standard of care by Plaintiff was the actual or proximate cause of Plaintiff's injuries.

**A.    Plaintiff Lacks The Requisite Expert Testimony To Establish The Applicable Standard of Care as to UNOS and Any Breach of The Standard of Care as to UNOS.**

In medical malpractice actions, in order to prevail, "the plaintiff must use expert testimony to establish both the required standard of care and the defendant's failure to conform to that standard, unless the subject matter lies within the ambit of common knowledge and experience, so that no special learning is needed to evaluate the conduct of the defendant." Pederson v. Gould, 288 S.C. 141, 142, 341 S.E.2d 633, 634 (1986). In South Carolina, "where a subject is beyond the common knowledge of the jury, expert testimony is required[,]" but "where a lay person can comprehend and determine an issue without the assistance of an expert, expert testimony is not required." Babb v. Lee Cty. Landfill SC, LLC, 405 S.C. 129, 153–54, 747 S.E.2d 468, 481 (2013) (citations omitted).  The determination of "what is within the knowledge of a lay jury and what requires expert testimony depends on the particular facts of the case, including the complexity and technical nature of the evidence to be presented and the trial judge's understanding of a lay person's knowledge."  Id. (citation omitted). "Whether expert testimony is required is a question of law." Graves v. CAS Med. Sys., Inc., 401 S.C. 63, 81, 735 S.E.2d 650, 659 (2012) (citing Mack Trucks, Inc. v. Tamez, 206 S.W.3d 572, 583 (2006)).

In Graves, a child's parents filed suit against the manufacturer of a baby monitor that was designed to alarm if the child was having difficulty breathing or an irregular heartbeat. Graves, 735 S.E.2d at 652. The plaintiff identified three experts to testify regarding the failure of a baby alarm and its software and a fourth expert to testify whether the baby could have been revived if the parents had been woken up by the alarm. Id. at 655. The defendant moved to exclude the experts' testimony, and the trial court granted the defendants' motion, finding that the four experts did not meet the reliability standards required for scientific testimony. Id. at 656. The defendant

then moved for summary judgment, contending that without expert testimony, the plaintiffs had no evidence of a design defect. Id. The appellate court agreed, finding that the testimony of the experts was unreliable regardless of whether it was deemed scientific or nonscientific. As a result of the exclusion of the plaintiff's witnesses, the appellate court found that the plaintiffs had not provided sufficient evidence to withstand summary judgment even despite plaintiff's claims that circumstantial evidence was sufficient. The Court found that the plaintiffs' claim involved complex issues of computer science and therefore required the support of expert testimony because "the design and structure of the software was beyond the ordinary understanding and experience of laymen." Graves, 735 S.E.2d at 659.

Here, the extent of UNOS's role as OPTN, its relationship to its member organ procurement organizations (OPOs), and the specific functionality of DonorNet[2] are issues beyond the scope of a layperson's experience and, therefore, require expert testimony. The determination of whether UNOS owed Plaintiff a duty to Plaintiff and whether UNOS breached any such duty is a medically and technically complex issue beyond common knowledge and lay experience, necessitating expert testimony. See In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices & Prods. Liability Litigation, 226 F. Supp. 3d 557, 569–70 (D.S.C. 2017) (citing Babb, 405 S.C. 129, 747 S.E.2d at 481) (holding that South Carolina "require[s] expert testimony at least where the issues are medically complex and outside common knowledge and lay experience"). Therefore, any evidence from Plaintiff himself is not competent to overcome this motion for summary judgment.

---

[2] "DonorNet" is software provided by UNOS to the transplant community that permits OPOs to manage deceased donor data, make offers to transplant hospitals, and for transplant hospitals to review donor documentation and imaging, and accept or decline organ offers. https://unos.org/technology/unet/

The five experts identified by Plaintiff are unreliable in support of Plaintiff's claims against UNOS and provide no evidence of the applicable standard of care nor any evidence of a breach of the same:

### i. Plaintiff's transplant surgeon expert, Anthony Panos, M.D., does not opine as to any standard of care applicable to UNOS nor breach of the same.

Expert Anthony Panos, M.D. is Plaintiff's transplant surgeon expert and testified at his deposition that he generally felt UNOS did not oversee the OPO as well as it should have to ensure the OPO was in compliance with UNOS policies for two reasons: 1) the OPO medical director was allegedly not licensed in South Carolina, the state wherein it functions, and 2) that UNOS could have provided more direction in policies regarding blood transfusion. Dr. Panos, however, admitted that he had not seen any applications or submittals by OPO WASH to UNOS regarding its Medical Director and his opinion is consequently based only on the assumption that Dr. Honig was the Medical Director at WASH in 2018. Specifically, Dr. Panos testified as follows:

Q:    Okay. So is it fair to say that your opinion that UNOS didn't oversee the OPO with regards to Dr. Honig is based on very little because you haven't seen any of the applications or submittals that they made to the OPTN?

A:    **That is correct.**

Q:    Okay. Is that just an assumption you are making?

A:    Assuming on the fact that she had been – it took until about 2020 to get the licensure.

Q:    Okay. But at the time of these events in November of 2018, you were unaware if the OPO had submitted any materials about Dr. Honig or Dr. Honig herself had reported to the OPTN her licensure, correct?

A:    **That is correct.**

Q:    All right. So it would be an assumption that UNOS did not oversee that process?

> A:    **Correct.**

(Panos Dep. 390: 5–391:1) (emphasis added). Dr. Panos also testified that UNOS could have provided more direction in its policies regarding blood transfusion, but further clarified this criticism and conceded that good medical judgment must be exercised irrespective of what the policies say, effectively shifting his criticism from UNOS to WASH. Dr. Panos specifically stated the following:

> A:    … The criticism I have is that we rely on them so much sometimes maybe we rely on them too much, that not everything is stated in a policy. That we must exercise good medical judgment irrespective of whatever policies say and try and do our best.
>
> Q:    That's more of a criticism of the OPO and the transplant surgeons, though, correct, that they rely on these policies too much?
>
> A:    **Correct.**

Dr. Panos's testimony is entirely devoid of any evidence of the standard of care applicable to UNOS or that UNOS failed to conform to any such standard.

> **ii.    Plaintiff's transfusion medicine and clinical pathology expert, Alexander Duncan, M.D., does not opine as to any standard of care applicable to UNOS nor breach of the same.**

Expert Alexander Duncan, M.D. is Plaintiff's transfusion medicine and clinical pathology expert, and admitted in his deposition that he is not knowledgeable as to UNOS's role or duty with regards to the Donor and has no qualifications to opine as to the same. Regarding the practices and standards that govern UNOS, Dr. Duncan conceded the following:

> Q:    Any information you have would have been learned through discussions with other colleagues of yours who served on the committee, not a direct service yourself?
>
> A:    … no, I haven't been to any committees and sat and listened to what was said.

(Duncan Dep. 158:12–21). Dr. Duncan proceeded to testify that he has only a naïve understanding of UNOS's duties as related to blood testing. (Duncan Dep. 160:24). He does not have a professional understanding of any duties applicable to UNOS regarding blood typing:

> Q:    Okay. And so as related to opinion 1 in your report, it's really – you are just surmising that UNOS had access to information retrospectively, that they should have had – in some form or fashion had a supervisory duty?
>
> A:    I don't know whether the information – I'm talking particularly the indeterminate blood type, who and when anybody at UNOS looked at that or not.
>
> Q:    You don't know?
>
> A:    **I do not know.**

(Duncan Dep. 171: 6–15) (emphasis added). Dr. Duncan opined that UNOS had access to information that allegedly would have revealed that the donor type had not been reliably determined, because UNOS allegedly had access to the VRL results in DonorNet. (Duncan Dep. 163:12–19). However, Dr. Duncan concedes he has never used DonorNet, is not familiar with any of its applications used to generate match runs, and his only understanding of what information is contained within DonorNet as part of the organ donation process is acquired only through conversations with colleagues, and not from any specific reading of information on DonorNet. (Duncan Dep. 164:9–25).

Dr. Duncan further concedes in his deposition testimony that "as far as I know, you conducted yourself [UNOS] according to the guidelines you [UNOS] had. Other people did not do what they were supposed to do according to your guidelines." (Duncan Dep. 170:23–171:1). Regarding Dr. Honig's licensure status as Medical Director of WASH, Dr. Duncan concedes he does not know of any application by WASH to UNOS when Dr. Honig assumed her role as Medical Director or any notification to UNOS by WASH that Dr. Honig was not licensed in South

Carolina. (Duncan Dep. 175:3–10). Accordingly, Dr. Duncan ultimately offered no professional, critical opinion of UNOS establishing any standard of care applicable to UNOS nor any corresponding breach of the same. Dr. Duncan's testimony therefore is ineffective to meet Plaintiff's burden of providing expert testimony of any evidence of the standard of care applicable to UNOS or that UNOS failed to conform to any such standard.

      **iii.**    **Plaintiff's clinical laboratory scientist expert, Becky Socha, M.S., M.L.S, does not offer any opinions against UNOS.**

Additionally, expert Becky Socha, M.S., M.L.S. is Plaintiff's clinical laboratory scientist expert and testified that she is not a qualified expert as to UNOS's role or duty in this matter and is not offering any opinions or criticisms against UNOS. Specifically, Ms. Socha testified as follows:

> Q:    Okay. Well, Ms. Socha, it's fair that you said a minute ago that you were not an expert as to UNOS' role in the organ donation process, correct?
>
> A:    Correct.
>
> Q:    Okay. Would it be fair then that you are not going to tell a jury that you are an expert as to UNOS' role or offer criticisms or opinions against UNOS?
>
> A:    **Yes, that is fair to say.**

(Socha Dep. 230: 2–11) (emphasis added). Ms. Socha's testimony therefore is ineffective to meet Plaintiff's burden of providing expert testimony of any evidence of the standard of care applicable to UNOS or that UNOS failed to conform to any such standard.

      **iv.**    **Plaintiff's liver transplant expert, Michael Millis, M.D., does not offer any opinions against UNOS.**

Similarly, expert Michael Millis, M.D. is Plaintiff's liver transplant surgery expert and testified that he also will not be offering any opinions against UNOS. Specifically, Dr. Millis

testified as follows:

> Q:    … I understand from your testimony earlier that you're not going to be offering any opinions as to UNOS; is that correct?
>
> A:    **That is correct.**

(Millis Dep. 224:17–21) (emphasis added). Dr. Millis's testimony therefore is ineffective to meet Plaintiff's burden of providing expert testimony of any evidence of the standard of care applicable to UNOS or that UNOS failed to conform to any such standard.

> **v.    Plaintiff's OPO expert, Melissa Bein, does not offer any opinions against UNOS.**

Finally, expert Melissa Bein is Plaintiff's OPO expert, known to be knowledgeable specifically about the organ transplant industry, also has no opinions as to UNOS and has testified that she will not be offering any opinions against UNOS at the time of trial. Specifically, Ms. Bein testified as follows:

> Q:    It's my understanding you do not intend to offer any opinions or criticisms of UNOS; is that correct?
>
> A:    **That is correct.**
>
> Q:    And in that same vein, you're not going to offer any criticisms or opinions as to any of the OPTN policies; is that correct?
>
> A:    **That's correct.**

(Bein Dep. 129: 14–21) (emphasis added). Ms. Bein's testimony therefore is ineffective to meet Plaintiff's burden of providing expert testimony of any evidence of the standard of care applicable to UNOS or that UNOS failed to conform to any such standard.

None of the five enumerated experts identified by Plaintiff have established any standards of care applicable to UNOS, nor any breaches of the same. Three of Plaintiff's experts have no opinions at all as to UNOS's involvement in this matter. For the reasons set forth above, the

remaining two experts identified by Plaintiff are unqualified to render any opinions against UNOS and establish any applicable standard of care as to UNOS, and neither expert offered any opinions or criticisms that UNOS breached any applicable standards of care. Accordingly, Plaintiff has not provided the requisite expert testimony to establish Defendant UNOS's acted or failed to act such that the discussion of proximate cause is even applicable to UNOS at this juncture.

> **B.    Plaintiff Lacks The Requisite Expert Testimony To Establish The Blood Typing Mismatch and/or Organ Mismatch Was The Proximate Cause Of Any Action or Inaction By UNOS.**

As previously discussed, Plaintiff must provide expert testimony that the "injuries complained of most probably resulted from the defendant's negligence," in order to meet a plaintiff's burden of proving proximate cause. Ellis by Ellis v. Oliver, 323 S.C. 121, 125 473 S.E.2d 793, 795 (1996); see also David v. McLeod Regl. Med. Ctr., 367 S.C. 242, 249, 626 S.E.2d 1, 4 (2006). Plaintiff "cannot establish a prima facie case of proximate cause" against UNOS because there is "no admissible evidence to support the crucial finding that the injury would not have occurred, or would have been less severe" if UNOS had acted or acted differently.  Testerman v. Riddell, Inc., 161 F. App'x 286, 290 2006 WL 41193, at *3 (4th Cir. 2006) (per curiam).

Assuming, arguendo, Plaintiff could establish through expert testimony the standard of care applicable to UNOS and any breach of the same by UNOS, Plaintiff has failed to provide any competent expert testimony from its five experts that UNOS did, or failed to do, anything that contributed to the harm alleged by Plaintiffs in their Complaint, or that the blood typing mismatch was the proximate cause and most probably the result of UNOS's actions or inactions.

Plaintiff's transplant surgeon expert, Dr. Panos, is critical of the verbiage of UNOS's policies regarding blood transfusions, but conceded in his deposition testimony that a change in verbiage may have helped "but it's not the direct proximate cause." (Panos Dep. 393:10-11). Dr.

Panos also conceded that he could not say that more likely than not, a change in verbiage would have prevented the outcomes in this case. (Panos Dep. 393:12–15). Accordingly, his testimony is inadequate as proof that Plaintiffs' injuries most probably resulted from any action or inaction by UNOS.

Plaintiff's transfusion medicine and clinical pathology expert Alexander Duncan, M.D. similarly opined that UNOS had knowledge of Dr. Honig's status as Medical Director in 2018 and that Dr. Honig was not licensed in South Carolina at that time. As discussed in Section II below, Plaintiff has not provided any evidence to support this allegation, and further discovery has revealed that Dr. Honig was not the Medical Director of WASH in 2018 at the time of this event. Notwithstanding these facts, Dr. Duncan clearly states the issue of Dr. Honig's medical license status at the time of these events is irrelevant to the outcomes of these cases:

> Q:    … do you have an opinion that if Dr. Honig had held a South Carolina license, it would have changed the outcome in these cases at all?
>
> A:    **No.**

(Duncan Dep. 175: 11–14) (emphasis added). Dr. Duncan's testimony is inadequate as proof that Plaintiffs' injuries most probably resulted from any action or inaction by UNOS, and is further inadequate as proof that the license status of Dr. Honig was the proximate cause of any harm alleged in this case. Melissa Bein, Becky Socha, and Dr. Millis have not offered any opinions regarding proximate cause as it relates to UNOS in this matter.

None of Plaintiff's five experts have offered opinions supportive of Plaintiff's assertion that Defendant UNOS, by action or inaction, was the proximate cause of Plaintiff's organ mismatch. Since Plaintiff's experts cannot determine whether the organ mismatch was caused by UNOS's provision of DonorNet and does not opine that the same was caused by UNOS's provision

of DonorNet or the wrongfully alleged status of Dr. Honig's license status as Medical Director of WASH, Plaintiff lacks the requisite expert testimony to support Plaintiff's negligence claim against UNOS. Therefore, UNOS is entitled to summary judgment as a matter of law.

II.    **Plaintiff's allegation that UNOS permitted WASH to be a member of the OPTN when its Medical Director, Dr. Jacqueline Honig, was not licensed by the State of South Carolina Board of Medical Examiners at the time of this event is demonstrably false, entitling UNOS to summary judgment as a matter of law.**

Federal regulations provide that an OPO's medical director must be a physician licensed in at least one state within the OPO's service area. 42 C.F.R. § 486.326(d). The OPO in this matter, WASH, is located in and has a service area of South Carolina. Plaintiff alleges that UNOS permitted WASH to be a member of the OPTN without a duly licensed Medical Director in South Carolina, that UNOS should have known that WASH, an OPTN member, did not have a duly licensed Medical Director in South Carolina, and that UNOS should have revoked WASH's OPTN membership as a result of the same. Specifically, Plaintiff alleges that UNOS was aware that WASH's Medical Director in 2018 was Dr. Jacqueline Honig, and that Dr. Honig was not licensed by the South Carolina Board of Medical Examiners until 2020. The parties have engaged in discovery regarding this issue and UNOS has produced documentation to Plaintiff that indicates that WASH represented to UNOS that its Medical Director was Dr. Richard Foster, Jr. and its Associate Medical Director was Dr. Timothy Whelan, both properly credentialed South Carolina physicians. (Exhibit A). Dr. Foster and Dr. Whelan held their respective roles from May 23, 2012 until early 2021, at such time Dr. Honig then became Medical Director. The events relevant to this cause of action occurred in 2018. Discovery has proven that Dr. Foster was WASH's Medical Director in 2018. Based on information provided by WASH to UNOS, Dr. Honig did not become Medical Director at WASH until 2021, three years after this event, and was duly licensed by the State of South Carolina at that time. (Exhibit B). In 2018, WASH had a South Carolina licensed

Medical Director in compliance with federal regulations, and appropriately reported that information to UNOS as OPTN. Accordingly, there is no genuine issue of material fact as to UNOS's knowledge of WASH's Medical Director's license status, and UNOS is entitled to summary judgment as a matter of law on this issue.

In addition, federal regulations *require* the OPTN to admit and retain as members all federally designated organ procurement organizations, including WASH. "Membership of the OPTN. (1) The OPTN **shall** admit and retain as members the following: (i) All organ procurement organizations;" 42 C.F.R. §121.3(b)(1)(i) (emphasis added). Thus, at all times relevant hereto, in 2018 WASH represented to UNOS that its medical director was a duly licensed physician in the state of South Carolina, in compliance with federal regulations. Therefore, there is no duty applicable to UNOS relative to WASH's status as a member of the OPTN, and UNOS is further entitled to summary judgement as a matter of law on this issue.

### III.    UNOS Is Entitled To Summary Judgment As A Matter Of Law Regarding Plaintiff's Claim For Punitive Damages.

UNOS is a nonprofit, charitable organization pursuant to the South Carolina Solicitation of Charitable Funds Act, S.C. Code §§ 33-56-10 to 33-56-200 (the "Charitable Funds Act"). The Charitable Funds Act provides, in pertinent part:

> A person sustaining an injury or dying by reason of the tortious act or commission of an employee of a charitable organization, when the employee is acting within the scope of his employment, may recover in an action brought against the charitable organization only the actual damages he sustains in an amount not exceeding the limitations of liability imposed in the South Carolina Tort Claims Act[.]

S.C. Code § 33-56-180(A) (emphasis added).  The Charitable Funds Act defines "charitable organization" as "any organization, institution, association, society, or corporation which is

exempt from taxation pursuant to Section 501(c)(3) or 501(d) of Title 26 of the United States Code, as amended." S.C. Code § 33-56-170(1).

UNOS is a 501(c)(3) nonprofit organization. (See Compl. ¶ 9–10 (adopting and incorporating UNOS's website into the Complaint); UNOS's Amended & Restated Articles of Incorporation at 1; UNOS's IRS Form 990 at 1). As such, UNOS falls squarely within the Charitable Funds Act's damages shield, barring Plaintiff's claims for punitive damages. Accordingly, UNOS is entitled to summary judgment as a matter of law with respect to Plaintiff's claims for punitive damages. Furthermore, punitive damages are inapplicable to Plaintiff's claims against UNOS, as Plaintiff has not provided the requisite expert testimony or any evidence indicating a genuine issue of material fact as to Plaintiff's claims against UNOS such that an award of punitive damages would be appropriate, should this matter move forward.

## IV. In the alternative, should Plaintiff's Claims against UNOS survive, UNOS is a 501(c)(3) charitable organization subject to statutory caps on damages for one single occurrence of allegedly offending conduct.

As stated above, UNOS is a nonprofit, charitable organization pursuant to the South Carolina Solicitation of Charitable Funds Act. Accordingly, a plaintiff may recover only the actual damages he sustains in an amount not exceeding the limitations on liability imposed by the South Carolina Tort Claims Act. S.C. Code § 33-56-180(A). The South Carolina Tort Claims Act provides, in pertinent part:

> [. . .] no person shall recover in any action or claim brought hereunder a sum exceeding three hundred thousand dollars because of loss arising from a single occurrence regardless of the number of agencies or political subdivisions involved.

S.C. Code Ann. § 15-78-120(a)(1) (emphasis added). An occurrence is defined as an "unfolding sequence of events which proximately flow from a single act of negligence." S.C. Code Ann. § 15-78-30(g).

The acts of negligence must be so separate and distinct, involving distinct entities, where no negligent act unfolds into another entity's negligent act, so as to be considered multiple occurrences. See Boiter v. South Carolina Dept. of Transp., 393 S.C. 123, 134, 712 S.E.2d 401, 406 (2011). In Boiter, SCDOT was determined to be negligent for not having a re-lamping policy in place for a burned-out traffic light, while SCDPS was found to be negligent in not following its own policy to notify a SCDOT technician when a light had burned out. Id. at 407, 712 S.E.2d at 134. The Court on appeal noted that SCDOT's negligent act did not unfold into SCDPS's negligent act because "SCDPS only became involved due to a citizen call regarding the burned-out light bulb; SCDOT never called SCDPS regarding the light, and SCDPS never informed SCDOT about the citizen call." Id.

Factually, this case is distinguishable from Boiter in that the entities involved in this matter are distinct, but their actions are not wholly independent of one another. Meaning, SCDOT and SCDPS in Boiter never communicated regarding the burned-out lamp, therefore their separate acts of negligence were not linked, and separate occurrences were merited under the statute. Here, the alleged negligent acts are linked by virtue of the claims against the entities referencing and cross-referencing the acts of each Defendant in relation to their utilization, or alleged lack thereof, regarding the Donor's blood typing data. Accordingly, the mistyping of the Donor's blood type and subsequent mismatch of organs in this case and the companion cases in Charleston County, South Carolina, Holliman v. UNOS, et al., and Lawrence v. UNOS, et al., constitute one occurrence for the purposes of calculating actual damages.[3] UNOS asserts that Plaintiff has not

---

[3] UNOS's assertion that the alleged negligent acts enumerated in Plaintiff's Complaint arise from the same occurrence does not suggest that the negligence of one is the negligence of all, as the employment of the statutory cap on damages arises after verdicts have been rendered, and the aforementioned argument should in no way be construed as an admission of negligence or liability on the part of UNOS.

provided any evidence to the contrary indicating that the caps on actual damages should not apply and that Plaintiff's causes of action should constitute separate occurrences for the purpose of calculating actual damages.

## CONCLUSION

There is no genuine dispute as to any material fact and Defendant UNOS is entitled to summary judgment as a matter of law because Plaintiff lacks the legally required expert testimony to establish that UNOS's provision of DonorNet software to enable the transplant community to share information "most probably" caused the organ mismatch. Instead, to the extent Plaintiff has presented any expert testimony, such testimony is, at best, speculative, tentative, and hypothetical. Following extensive discovery, Plaintiff has not provided a scintilla of evidence supporting its claims against UNOS. Accordingly, the Court should grant summary judgment in Defendant UNOS' favor with respect to Plaintiff's claims against UNOS and dismiss UNOS from the case with prejudice.

HALL BOOTH SMITH, P.C.

*/s/Lauren Spears Gresh*
Alan R. Belcher, Jr., Fed. ID No. 9342
Lauren Spears Gresh, Fed. ID No. 11740
111 Coleman Boulevard, Suite 301
Mount Pleasant, South Carolina 29464
Phone: 843.720.3460
lgresh@hallboothsmith.com
*Counsel for United Network for Organ Sharing*

March 20, 2023