**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| Aaliyah Patterson, Administratrix of the Estate of Joe Patterson,<br><br>Plaintiff,<br><br>vs.<br><br>We Are Sharing Hope SC, United Network for Organ Sharing, Elizabeth Davies, M.D., Jacqueline Honig, M.D., and Darla Welker,<br><br>Defendants. | C/A#: 2:21-cv-01242-BHH<br><br>**DR. JACQUELINE HONIG'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT** |

Defendant Jacqueline Honig, M.D. ("Dr. Honig"), by and through her undersigned counsel, hereby moves the Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, to issue an Order granting summary judgment with respect to the claim against her brought by Plaintiff.[1] Given that Plaintiff cannot meet the basic elements of a negligence cause of action against a physician, the claim against Dr. Honig for negligence fails as a matter of law. Accordingly, summary judgment as to Dr. Honig should be granted, dismissing Plaintiff's negligence claim against her.[2]

**INTRODUCTION**

This case arises out of a November 2018 liver transplant received by Joe Patterson. Mr. Patterson received a donor liver through the federal Organ Procurement and Transplantation

---

[1] Pursuant to Rules 7.04 and 7.05 of the Local Civil Rules (D.S.C.), Dr. Honig provides that a full explanation of the motion is contained within this document, such that an additional memorandum would serve no useful purpose.

[2] Dr. Honig also specifically relies on and incorporates Defendant We Are Sharing Hope SC's ("Sharing Hope") Motion for Summary Judgment and arguments therein (ECF No. 120) as if stated verbatim herein.

Network ("OPTN") as managed by Defendant United Network for Organ Sharing ("UNOS"). Based on the data reported by Sharing Hope, the OPTN's Organ Procurement Organization ("OPO") for the State of South Carolina, the donor's liver was listed as available for transplant with the donor having type "O" blood in the OPTN's transplant database, DonorNet. Mr. Patterson, who had type "O" blood, was matched with the donor's liver. Thereafter, Dr. Davies, a surgeon from Vanderbilt University Medical Center, traveled to South Carolina to participate in the organ recovery; upon returning to Tennessee, the donor's liver was transplanted into Mr. Patterson. Mr. Patterson suffered complications following his transplant surgery, and it was later discovered that the donor's blood was type "A."  Mr. Patterson's body ultimately rejected the donor liver, and in 2019, he underwent a second liver transplant. Mr. Patterson later passed away in 2021.

Mr. Patterson brought this action asserting claims against Dr. Honig, Sharing Hope, Darla Welker, and Dr. Davies. The allegations of negligence against Dr. Honig revolve around her actions in evaluating and reporting the donor's blood type. However, Dr. Honig was neither contacted about nor expected to be contacted about the donor's blood type; therefore, she never directed, evaluated, or reported the donor's blood type.

As they relate to Dr. Honig, Plaintiff alleges only one cause of action against her for Negligence/Gross Negligence/Recklessness Resulting in Wrongful Death. Plaintiff alleges she was responsible for implementing Sharing Hope's protocols for donor evaluation and management and for overseeing the clinical management of potential donors. Plaintiff also alleges she is responsible for ensuring that potential donors are thoroughly assessed for medical suitability for organ donation. Further, Plaintiff points to Dr. Honig's failure to be a South Carolina licensed physician at the time of the incident as some form or contribution to her negligence.

Specifically, Plaintiff alleges Dr. Honig breached her duty of care and deviated from the standards of care in the following ways: (a) failing to ensure that Sharing Hope had an adequate policy, procedure, or protocol regarding discrepancies in donor blood type test results; (b) failing to ensure that SHSC followed the policy it did have regarding discrepant donor blood typing results; (c) failing to review the Donor's records or to ensure that they were reviewed by SHSC's Associate Medical Director; (d) failing to recognize or ignoring the fact that the samples used to perform ABO blood typing for the Donor were collected after the Donor received massive emergency blood transfusions; (e) failing to recognize or ignoring the fact that pre-transplant laboratory testing results from VRL reported that the Donor's blood type was indeterminate and discrepant; (f) permitting the Donor to be reported as having type O blood despite pretransplant laboratory testing results from VRL reporting that the Donor's blood type was indeterminate and discrepant; (g) permitting the Donor's organs to be reported as available for transplant and to be distributed despite pre-transplant laboratory testing results from VRL reporting that the Donor's blood type was indeterminate and discrepant; (h) failing to supervise and assist in the management of the Donor adequately; (i) failing to ensure that the Donor was assessed thoroughly and appropriately for medical suitability for organ donation; and (j) serving as Sharing Hope's Medical Director without being a South Carolina licensed physician.

Dr. Honig denies the allegations of negligence and seeks summary judgment based on the undisputed facts that conclusively show that she did not have a patient/physician relationship with Plaintiff, that Sharing Hope and its administrator on call Welker complied with the controlling OPTN policy for determining ABO types of deceased donors, and that she was neither responsible for nor consulted about the reporting of the blood typing results. Therefore, Dr. Honig offered no treatment or assessment in this case which could have proximately caused damage to Plaintiff.

Moreover, any claims related to her lack of South Carolina medical license fail as there is no evidence that such failure to be licensed in South Carolina was a breach of the medical standard of care or that it proximately caused any damage to Plaintiffs. Finally, Dr. Honig is entitled to summary judgment pursuant to the civil immunity afforded by the South Carolina Revised Anatomical Gift Act, S.C. Code § 44-43-385.

## FACTS

On November 24, 2018, Grand Strand Regional Medical Center ("Grand Strand") reported to Sharing Hope that it had identified a potential organ donor. This triggered the OPO's protocols as mandated by the OPTN policies. A Clinical Donation Coordinator ("CDC") was assigned to perform tasks at the donor hospital. **Exhibit A**, Donor Call Note, Nov. 24, 2018. The donor was declared brain dead on November 25, 2018, at 4:34pm. **Exhibit B**, Donor Case Note, Nov. 25, 2018. Dr. Honig, the medical director on call at the time, was contacted by Sharing Hope's on-site staff on November 25, 2018, at approximately 5:30 pm, at which time Dr. Honig took a verbal report of the donor's pertinent medical condition from the CDC and determined that the Grand Strand patient was a medically suitable donor. **Ex. B**; *see also* **Exhibit C**, Deposition of Dr. Jaqueline Honig. pp. 44:23-25; 92:9–93:9.

In compliance with OPTN policy §2.6.A, Sharing Hope staff requested that the hospital nurses draw blood samples for ABO blood typing. *See* **Exhibit D**, Deposition of Darla Welker, pp. 30:13-22; 64:11-16. One sample was drawn on November 25, 2018, at 1900; and a second sample was drawn on the same day at 1905. **Exhibit E**, Indeterminant Blood Typing Results, Nov. 25, 2018. Those samples were transported to VRL, a certified lab, that conducted ABO testing and serology/infectious disease testing; however, VRL did not report an ABO blood type; rather, VRL issued "indeterminate" results for both samples. **Ex. E**.

Defendant Darla Welker was Sharing Hope's administrator on call ("AOC"), who was responsible for verifying[3] and reporting the ABO blood type to UNOS through DonorNet. **Ex. D**, Welker Depo., pp. 21:1-20; 24:13-16. When she reviewed the VRL indeterminate finding, she communicated and conferred with the Sharing Hope employees on-duty and on-site at Grand Strand about how to comply with the requirements of §2.6.A. **Ex. D**, Welker Depo., pp. 25:11-23; 48:25–49:15. Importantly, at the time, there was no policy at all mentioning indeterminate results and no policy requiring consultation with the medical director in such instances in either the Sharing Hope or the OPTN policies. It is undisputed that no one contacted Dr. Honig about the indeterminate finding or the donor's blood type at all, and Dr. Honig did not become aware of any such information until after the transplant took place. **Ex. C**, Honig Depo., pp. 75:9-13 94:11-17; Ex. **D**., Welker Depo., pp. 48:25-49:15.

The Sharing Hope personnel, in compliance with policy, determined that there were two matching ABO results from the Grand Strand blood bank in the donor's medical records from samples drawn almost 24 hours apart. **Ex. D**, Welker Depo., pp. 25:11-23; 48:25–49:15. One blood sample was drawn on November 24, at 23:09 with an "O" result reported; and a second blood sample was drawn on November 25 at 19:50 with an "O" result reported. **Exhibit F**, Grand Strand ABO Blood Typing, Nov. 24-25, 2018. Thus, there were two samples that were drawn at two separate times that were tested by a certified lab that reported results of "O" blood type on both samples, meeting the requirements of OPTN policy § 2.6.A. Accordingly, Sharing Hope, through Ms. Welker, reported in DonorNet that the donor's blood type was "O;" and the Grand

---

[3] In November of 2018, the AOC and Clinical Allocation Technician ("CAT") performed a two-person verification of the ABO blood type.

Strand ABO results were uploaded to DonorNet as source documents for the ABO determination[4] along with one of the VRL indeterminant ABO results.

Dr. Honig became a medical director of Sharing Hope in August 2018. Outside of her work as a medical director, Dr. Honig's main area of medical practice has been critical care, a field she has been licensed in for almost three decades. **Ex. C**., Honig Depo. pp.9:11-10:5. She did her residency in anesthesiology at George Washington University And completed a fellowship in critical care medicine. *Id.* She also served as the associate medical director of the Washington, D.C. OPO since 2009 and is still the associate medical director there. *Id.* at pp. 16:23-17:13. As a medical director, Dr. Honig is responsible for reviewing and signing off on policies or guidelines when they come up for revisions, medical suitability, organ donor optimization, and to be available as the staff needs her. *Id.* at pp. 25:7-26:25. Dr. Honig testified that she complied with the standard of care for assessing the donor for medical suitability. *Id*. at pp. 92:9-94:9. Medical suitability in the context of a medical director assessing an organ donor in 2018 did not involve ABO review.

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that: "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The purpose of summary judgment motions is "to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Thus, these motions serve to provide a "threshold inquiry of determining whether there is the need for a trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A motion for summary judgment presents to the trial judge the questions of whether "there are any genuine factual issues that properly can be

---

[4] 42 CFR §486.344(c)(4).

resolved only by a finder of fact because they may reasonably be resolved in favor of either party" or whether the evidence is "so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 249, 250, 251–52.

## **ARGUMENT**

In order to recover in a negligence action, the Plaintiff must show: a duty of care owed by the defendant to the plaintiff; a breach of that duty by a negligent act or omission; and damages proximately resulting from the breach. *See Shaw v. City of Charleston*, 351 S.C. 32, 567 S.E.2d 530 (Ct. App. 2002). A duty of care "embodies the principle that the plaintiff should not be called to suffer a harm to his person or property which is foreseeable, and which can be avoided by the defendant's exercise of reasonable care." *Snow v. City of Columbia*, 305 S.C. 544, 409 S.E.2d 797 (Ct. App. 1991). In the context of negligence against a physician, to establish a duty, the must be "a doctor-patient relationship between the parties." *Brouwer v. Sisters of Charity Providence Hospitals*, 409 S.C. 514, 521–22, 763 S.E.2d 200, 203–04 (2014). Additionally, a plaintiff must provide expert testimony to establish the required standard of care and that the physician departed from the applicable standards. *Pederson v. Gould,* 288 S.C. 141, 143–44, 341 S.E.2d 633, 634 (1986); *David v. McLeod Reg'l Med. Ctr.*, 367 S.C. 242, 247–48, 626 S.E.2d 1, 4 (2006). Negligence may not be presumed from an injury because South Carolina does not recognize *res ipsa loquitur*. *Fletcher v. Med. Univ.*, 390 S.C. 458, 702 S.E.2d 372 (Ct. App. 2010). Plaintiff must also show the breach of duty was the proximate cause of the injury, which is shown by establishing the injury would not have occurred but for the defendant's negligence. *Hurd v. Williamsburg County*, 353 S.C. 596, 579 S.E.2d 136 (Ct. App. 2003), *aff'd*, 363 S.C. 421, 611 S.E.2d 488 (S.C. 2005). Proximate cause requires proof of both causation in fact and legal cause. *Rush v. Blanchard,* 310 S.C. 375, 426 S.E.2d 802 (1993); *Oliver v. South Carolina Dep't of Hwys. and*

*Pub. Transp.,* 309 S.C. 313, 422 S.E.2d 128 (1992); *Vinson v. Hartley,* 324 S.C. 389, 477 S.E.2d 715 (Ct.App.1996). Causation in fact is proved by establishing the injury would not have occurred "but for" the defendant's negligence. *Rush, supra; Thomas v. South Carolina Dep't of Hwys. and Pub. Transp.,* 320 S.C. 400, 465 S.E.2d 578 (Ct. App. 1995).

For the reasons set forth below, there are no genuine issues of material fact with respect to Plaintiff's negligence claim against Dr. Honig. Accordingly, Dr. Honig is entitled to summary judgment as a matter of law.

**A. Dr. Honig is Entitled to Summary Judgment Regarding the Allegations of Her Treatment/Assessment of Donor's Blood Type Results.**

Allegations (c) through (i) in Paragraph 69 of the Complaint, which outline Dr. Honig's alleged deficiencies, are targeted towards medical treatment provided by or failed to be provided by Dr. Honig. *See* ECF No. 1, ¶ 69. However, these allegations cannot withstand summary judgment because it is categorically undisputed that Dr. Honig was never notified about, called about, or asked to weigh in on the treatment of the Donor with respect to the indeterminate results or other aspects of donor management after discussing medical suitability of the donor. *See* **Ex. C**, Honig Depo., pp. 75:9-13 94:11-17; **Ex. D**., Welker Depo., pp. 48:25-49:15.  This is consistent with Sharing Hope's policies and procedures and the national standard in 2018. Pursuant to the policies and procedures of Sharing Hope at the time of the incident, Dr. Honig as the medical director did not have responsibility for reporting the blood type of the donor to potential recipients. *See* **Exhibit G,** June 14, 2018 Organ Recovery Policy **(**the medical director is not mentioned at all in Sharing Hope's June 14, 2018 Organ Recovery policy). Moreover, 42 C.F.R. § 486.344, delineates that a medical director is responsible for "ensuring that potential donor evaluation and management protocols are implemented correctly and appropriately to ensure that potential donors are thoroughly assessed for medical suitability for organ donation and clinically

8

managed to optimize organ viability and function, but that regulation does not provide that Dr. Honig was responsible for blood typing." Additionally, there is no indication in the record that Dr. Honig had a doctor-patient relationship with potential recipients, like Joe Patterson.

Further, Dr. Honig testified about her responsibilities as the medical director of Sharing Hope. She acknowledged she was responsible for ensuring that the potential donor was medically suitable for donation and to help optimize organ function and to be available if needed and that as part of the process, she reviewed the donor's medical records verbally through a discussion with the clinical donation coordinator regarding medical suitability. **Ex. C**, Honig Depo., pp. 44:23-25; 92:9–93:9. However, Dr. Honig testified—and Plaintiffs have not refuted—that blood typing is **<u>not</u>** a condition of donor suitability; therefore, it is not something in which she is involved or expected to be involved. **Ex. C**., Honig Depo., p. 24:3-8.

Thus, specifically with respect to this case, Dr. Honig testified that she was notified about the donor after authorization on November 25, 2018, about medical suitability, which involves a list of pieces of information that are provided to her by the coordinator. It is undisputed that she did not receive any other call about any issue that needed to be escalated to a medical director. Dr. Honig also testified, and the policies and national standard reveal, that medical directors would not be involved in donor blood type reporting. Indeed, even Plaintiff's expert Becky Socha, who attempted to opine that Dr. Honig should have been alerted and reviewed the case when the indeterminate results came back from VRL, conceded that the 2018 OPTN policies did not require the medical director to be contacted for ABO type reporting. **Exhibit H**, Deposition of Becky Socha, pp. 119:5-15, 127: 3-13. Although Plaintiff's expert Dr. Panos opined Dr. Honig deviated from the standard of care because she failed to provide adequate oversight of this donor case in

that she did not access DonorNet on her own, he also conceded that no such requirement was in the policies in place at the time. **Exhibit I**, Deposition of Dr. Panos, pp.108:12–109:10.

Notably, however, none of Plaintiff's experts are or ever have been either a medical director or an executive director of an OPO. To prove a claim of negligence against healthcare professionals, especially as it relates to the element of breach, Plaintiff must provide expert testimony to establish the required standard of care and that Dr. Honig departed from the applicable standards. *Pederson,* 288 S.C. at 143–44, 341 S.E.2d at 634; *McLeod Reg'l Med. Ctr.*, 367 S.C. at 247–48, 626 S.E.2d at 4. Even assuming Plaintiff can meet the duty element of showing there was a doctor-patient relationship with Dr. Honig, which she cannot, Plaintiff's experts' opinions on the standard of care applicable to Dr. Honig and alleged breaches thereof do not provide the necessary qualified or reliable opinions which might carry Plaintiff's burden, as none of Plaintiff's experts have ever served as a medical director or assistant medical director for an OPO.[5]   While exact specialization is not required generally, it is clear that the role of a medical director, and Plaintiff's allegations regarding the same, is unique and is not that of a standard physician.  Thus, a medical director expert is required to opine as to the standard of care for a medical director of an OPO, not merely a critical care physician or transplant physician. Moreover, as is the case here, a medical director's duties are often defined within the policies and procedures of the organization by whom they are employed. Such duties cannot be created out of whole cloth by unqualified experts.

While Plaintiff's failure to have necessary expert testimony regarding Dr. Honig's standard of care as a medical director of an OPO is fatal, it is only one of several reasons Plaintiff's claims

---

[5] Dr. Honig also is filing a *Daubert* motion to exclude these experts' opinions related to her. Moreover, Dr. Honig specifically incorporates and adopts herein by reference Defendants We Are Sharing Hope SC and Darla Welker's Motion in Limine to Exclude "Standard of Care" Opinions of Plaintiff's Experts Duncan, Socha, Millis, and Bein. (ECF No. 119).

fail. Indeed, it is undisputed that Dr. Honig did not have a doctor-patient relationship with Joe Patterson and was not contacted with respect to the specific issue that is at the heart of this litigation, the ABO of the Donor. Thus, there is no genuine issue of material fact that Dr. Honig did not offer, and was not contacted regarding, any treatment or assessment of the indeterminate blood type results and decisions related thereto. As such, she is entitled to summary judgment on the treatment/assessment allegations enumerated above.

**B. Dr. Honig is Entitled to Summary Judgment with Respect to the Allegations Concerning Her Failure to Be Licensed in South Carolina at the Time of the Incident.**

Curiously, Plaintiffs allege that Dr. Honig was negligent in failing to be licensed in South Carolina at the time of the incident. *See* ECF No. 1, ¶69(j). While it is undisputed that Dr. Honig did not have a South Carolina medical license at the time in question, although she was licensed in Maryland and Washington, D.C.,[6] Plaintiff woefully fails to satisfy the elements of negligence with respect to a regulatory issue, including breach of a standard of care and proximate cause.

Case law is clear that a plaintiff cannot recover for an administrative licensing violation without proving that the lack of a license was a proximate cause of the injury. *See Talley v. Danek Med., Inc.*, 179 F.3d 154, 159 (4th Cir. 1999) (holding that the administrative requirement that a medical device be approved by the FDA before being marketed is analogous to the failure to have a driver's license, and a plaintiff must prove breach of a substantive standard of care and proximate cause of the injury); *see also Hurst v. Sandy*, 329 S.C. 471, 494 S.E.2d 847, 851 (Ct. App. 1997) (finding that violation of a statute requiring engineers to be licensed did not provide a basis for a negligence per se claim; and noting that any event, a plaintiff would have to prove that the lack of license was causally linked to the injury).

---

[6] **Ex. C**., Honig Depo., p. 8:15-19.

To the extent that Dr. Honig was in technical noncompliance with the licensing requirement, it is a regulatory issue, and *none* of Plaintiff's experts have opined that the licensure issue in any way proximately caused Mr. Patterson's injury.[7] In fact, while Plaintiff's expert Dr. Millis attempted to opine on Dr. Honig's licensing issue, he also conceded that there is no proximate cause associated with her failing to be licensed in South Carolina. **Exhibit J**, Deposition of Dr. Millis, pp. 241:23–242:2. Likewise, Plaintiff's expert Dr. Duncan also admitted that Dr. Honig's lack of a South Carolina medical license was not a proximate cause of the injuries in this case.[8] **Exhibit K**, Deposition of Dr. Duncan, pp. 175:11-18. This is a necessary concession as Dr. Honig did not provide treatment or assessment of Donor's blood type results and Sharing Hope's policies and procedures are nationally compliant with OTPN, not germane or unique to South Carolina.

Thus, there is no genuine issue of material fact with respect to Dr. Honig's South Carolina medical license and Dr. Honig is entitled to summary judgment as a matter of law.

**C. Dr. Honig is Entitled to Summary Judgment with Respect to the Allegations Concerning Sharing Hope's Policies and Procedures**.

---

[7] It is undisputed that at the time of the incident, Sharing Hope had another medical director who was licensed in South Carolina.

[8] Plaintiff's expert Becky Socha, a medical technologist trained in transfusion medicine who has never been a medical director of an OPO, also attempted to criticize Dr. Honig for not being licensed to practice medicine in South Carolina; however, like Plaintiff's other experts, she made no attempt (nor could she) to causally connect this issue with any aspect of Plaintiff's damages. *See* **Ex. H**, Socha Depo., pp. 120:9-121:1.

Plaintiff's expert Dr. Panos, who also has never been a medical director of an OPO, likewise criticized Dr. Honig because she was not licensed in South Carolina at the time. However, Dr. Panos could not identify any specific way in which her lack of a South Carolina license affected the outcome, only generalizing that it was "unprofessional" and indicated a lack of concern for following regulations. *See* **Ex. I**, Panos Depo., pp. 106:9–108:11. Even viewing such testimony in the light most favorable to Plaintiff, such generalization does not come close to reaching proximate cause of Plaintiff's damages, even under the most liberal of constructions.

With respect to the allegations concerning Sharing Hope's policies, specifically allegations (a) and (b) in Paragraph 69 of the Complaint, these allegations also cannot withstand summary judgment. *See* ECF No. 1, ¶69.

First, it is undisputed that Dr. Honig was hired by Sharing Hope in August 2018, and the policy in place for ABO testing at the time of the incident was enacted in June 2018, prior to her start date with Sharing Hope. Again, Plaintiff fails to offer any expert testimony from a qualified expert, i.e., a medical director, who has drafted policies and procedures for an OPO that the policy in place at Sharing Hope as of June 2018 was deficient. Further, Plaintiff has failed to provide any testimony or documentation that policies from other comparable OPOs contained language or procedures that should have been in the Sharing Hope policy in 2018.

With respect to the adequacy of and compliance with Sharing Hope's policies and procedures, Dr. Honig specifically relies on and incorporates herein Sharing Hope's Motion for Summary Judgment and accompanying Memorandum in Support regarding the same. *See generally* ECF No. 120.

### D. Dr. Honig is Entitled to Summary Judgment Under the Good Faith Immunity Provision of the South Carolina Revised Anatomical Gift Act, S.C. Code 44-43-385.

For judicial efficiency, Dr. Honig relies on and incorporates herein Sharing Hope's Motion for Summary Judgment and accompanying Memorandum in Support regarding the Sharing Hope Defendants and Dr. Honig's entitlement to summary judgment based upon the good faith immunity provision of the South Carolina Revised Anatomical Gift Act, S.C. Code Ann. 44-43,385. *See* ECF No. 120, pp.28-32.

### E. Dr. Honig is Entitled to Summary Judgment Pursuant to S.C. Code Ann. 33-56-180's Bar for Liability for Employees of Charitable Organizations.

The South Carolina Solicitation of Charitable Funds Act (CFA), S.C. Code Ann. §33-56-180, provides limitations on liability for charitable organizations and their employees. More specifically, judgment cannot be rendered against an employee of a charitable organization unless gross negligence is proven:

> (A) A person sustaining an injury or dying by reason of the tortious act of commission or omission of an employee of a charitable organization, when the employee is acting within the scope of his employment, may recover in an action brought against the charitable organization only the actual damages he sustains in an amount not exceeding the limitations on liability imposed in the South Carolina Tort Claims Act in Chapter 78 of Title 15. An action against the charitable organization pursuant to this section constitutes a complete bar to any recovery by the claimant, by reason of the same subject matter, against the employee of the charitable organization whose act or omission gave rise to the claim unless it is alleged and proved in the action that the employee acted in a reckless, wilful, or grossly negligent manner, and the employee must be joined properly as a party defendant. **A judgment against an employee of a charitable organization may not be returned unless a specific finding is made that the employee acted in a reckless, wilful, or grossly negligent manner**. ....

S.C. Code Ann. §33-56-180 (emphasis added). It is undisputed that Sharing Hope is a charitable organization, as defined under §33-56-20 and admitted by Plaintiff,[9] and Dr. Honig is an employee of Sharing Hope. Dr. Honig is entitled to summary judgment pursuant to section 33-56-180 because there is no evidence to create any jury issue as to whether she committed gross negligence in her role as the medical director of Sharing Hope.

Section 33–56–180 does not define what it means to act in a grossly negligent manner. In the absence of a statutory definition, this Court can rely on South Carolina Supreme Court's definition of gross negligence, which is "the intentional conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not to do. It is

---

[9] *See* **Exhibit L**, Plf. Resp. to Sharing Hope's Requests for Admission No. 1, Oct. 23, 2020.

the failure to exercise slight care." *Jinks v. Richland County*, 355 S.C. 341, 345, 585 S.E.2d 281, 283 (2003) (citations omitted). The issue of gross negligence may be resolved on summary judgment:

> "[W]hile gross negligence, for the purpose of the gross negligence exception to the limited liability of a charitable organization, ordinarily is a mixed question of law and fact *when the evidence supports but one reasonable inference, the question becomes a matter of law for the court*. Code 1976, § 33-56-180(A)." *Etheredge v. Richland Sch. Dist. One,* 341 S.C. 307, 310, 534 S.E.2d 275, 277 (2000).

*Pack v. Associated Marine Institutes, Inc.*, 362 S.C. 239, 245, 608 S.E.2d 134, 138 (Ct. App. 2004) (emphasis added). Quite simply, Plaintiff has not set forth any evidence upon which a jury reasonably could conclude that Dr. Honig failed to use slight care. To the contrary, the evidence collectively establishes, beyond any genuine dispute, that she was not notified of or asked to assess the blood type of Donor and that Sharing Hope's personnel complied with the Sharing Hope and OPTN policies in place at the time in question.

As noted herein and in Sharing Hope's Memorandum in Support of its Motion for Summary Judgment (ECF No. 120), certain of the Plaintiff's experts have offered varied opinions that Sharing Hope (by and through its staff) violated alleged standards of care in determining and reporting the Donor's blood type as "O" and that Dr. Honig breached the standard of care with regard to the Donor and/or her medical license. But in each instance, the experts conceded that the 2018 OPTN policies did not require use of pretransfusion or non-hemodiluted blood for ABO typing, and the policies did not provide any direction or guidance as to how an OPO was to address or resolve "indeterminate" ABO results. These same experts necessarily conceded that Dr. Honig was not notified of or asked to assess the ABO typing issue and that her technical failure to have a South Carolina medical license was not the proximate cause of any damage incurred by Plaintiff.

15

Upon these circumstances, as a matter of law, Dr. Honig used at least slight care. Any opinions that Dr. Honig could have done "more" to investigate the indeterminate results cannot negate the only reasonable finding that Dr. Honig exercised at least slight care. *See Pack*, 608 S.E.2d at 138 ("The fact that more might have been done does not negate a finding that RMI employees exercised at least slight care."); *see also Etheredge v. Richland Sch. Dist. One*, 341 S.C. 307, 310, 534 S.E.2d 275, 278 (2000) ("[T]he fact that the School District might have done more does not negate the fact that it exercised 'slight care.'"). Accordingly, no reasonable jury could conclude that Dr. Honig was grossly negligent, and she is entitled to summary judgment as a result of S.C. Code Ann. §33-56-180 as well.

## CONCLUSION

As outlined above, Dr. Honig is entitled to judgment as a matter of law in her favor as to Plaintiff's claim of negligence against her in her second causes of action. Plaintiff does not have any evidence to dispute that Dr. Honig was neither involved in the ABO decision nor was she required by the Sharing Hope or the OPTN policies to be involved in such decision. Further, Plaintiff does not have competent evidence that Dr. Honig's failure to have a South Carolina medical license at the time of the events alleged herein proximately caused any damages to Plaintiff, a fact which even has been conceded by Plaintiff's expert witnesses. Therefore, as Plaintiff cannot prove each and every element of her claim against Dr. Honig, Plaintiff's claim against her must be dismissed, and summary judgment should be granted.

    Respectfully submitted,

    s/ John T. Lay, Jr.
    John T. Lay, Jr. (Fed ID 5539)
    Lindsay Joyner (Fed ID 11557)
    Jessica Laffitte (Fed ID 11846)
    Kendall Crawford (Fed ID 13565)
    Gallivan, White & Boyd, P.A.

PO Box 7368
Columbia, SC 29202-7368
jlay@gwblawfirm.com
ljoyner@gwblawfirm.com
jlaffitte@gwblawfirm.com
kcrawford@gwblawfirm.com
(803) 779-1833 Ofc

*Attorney for Defendant Jacqueline Honig, M.D.*

April 7, 2023

17