# EXHIBIT 1

# Deposition Excerpts of Elizabeth Davies

2:21-cv-01242-BHH     Date Filed 04/11/23     Entry Number 132-1     Page 2 of 18

Aaliyah Patterson vs We Are Sharing Hope SC, et al.
Elizabeth Davies, M.D. on 09/29/2022

```
 1                UNITED STATES DISTRICT COURT
                  DISTRICT OF SOUTH CAROLINA
 2                     CHARLESTON DIVISION

 3                              Case No.: 2:21-cv-1242-BHH

 4    Aaliyah Patterson, as Administratrix
      of the Estate of Joe Patterson,
 5
                     Plaintiff,
 6
      vs.
 7
      We Are Sharing Hope SC, United
 8    Network for Organ Sharing, Elizabeth
      Davies, M.D., Jacqueline Honig, M.D.,
 9    and Darla Welker,

10                   Defendants.
      _____/
11

12          DEPOSITION OF ELIZABETH DAVIES, M.D.

13
                 Thursday, September 29, 2022
14                 10:02 a.m. - 11:45 a.m.

15
              Vanderbilt University Medical Center
16                  3322 West End Avenue
                       Suite 11000,
17              Nashville, Tennessee 37203

18

19

20

21

22

23
            Examination of the witness taken before:
24
                      Cicely Moore, RPR
25                 Huseby Global Litigation
```

2:21-cv-01242-BHH   Date Filed 04/11/23   Entry Number 132-1   Page 3 of 18

Aaliyah Patterson vs We Are Sharing Hope SC, et al.
Elizabeth Davies, M.D. on 09/29/2022                                    Page 9

| | | |
|---|---|---|
| 1 | Q. | But not hearts?  Not lungs? |
| 2 | A. | No, sir. |
| 3 | Q. | Okay.  And train residents, was that train residents in the removal of organs or in other surgeries? |
| 5 | A. | Only that, removal of organs, but training them in the techniques of open surgery as opposed to laparoscopic surgery. |
| 8 | Q. | And did the training of residents take place in any context other than your removal of organs? |
| 10 | A. | No. |
| 11 | Q. | And you stayed at Vanderbilt until when? |
| 12 | A. | December 31st, 2018. |
| 13 | Q. | So you were at Vanderbilt for two years? |
| 14 | A. | About 20 months. |
| 15 | Q. | And you left Vanderbilt why? |
| 16 | A. | I wanted to go back home. |
| 17 | Q. | It was -- it was a voluntary decision of yours to leave Vanderbilt? |
| 19 | A. | Absolutely. |
| 20 | Q. | And did you have other employment at the time you left Vanderbilt? |
| 22 | A. | No. |
| 23 | Q. | Are you currently employed? |
| 24 | A. | No. |
| 25 | Q. | Have you been employed since you left Vanderbilt? |

2:21-cv-01242-BHH     Date Filed 04/11/23     Entry Number 132-1     Page 4 of 18

Aaliyah Patterson vs We Are Sharing Hope SC, et al.
Elizabeth Davies, M.D. on 09/29/2022                    Page 10

1    A.   No.

2    Q.   Dr. Davies, when you were an organ procurement

3  surgeon here at Vanderbilt, were you aware that significant

4  blood transfusions could temporarily affect blood type?

5    A.   Explain the question.

6    Q.   Tell me what part of that question you don't

7  understand.

8    A.   What's the word "significant" mean?

9    Q.   Well, you tell -- you tell me.  Were you aware --

10 were you aware -- when you -- when you were a transplant

11 surgeon at Vanderbilt, were you aware that blood

12 transfusions could temporarily affect blood types?

13   A.   I don't think so, not -- not -- not the way --

14 not in a clinically significant manner.

15   Q.   What is a clinically insignificant manner?

16   A.   Clinically significant manner.

17   Q.   Right.  What would be clinically insignificant?

18   A.   What would be clinically insignificant?  Giving

19 blood that did not affect the outcome of testing.

20   Q.   Okay.  If a donor -- potential organ donor has

21 virtually their entire blood system replaced with blood of

22 a different type, were you aware that that could affect the

23 blood test of that donor?

24   A.   In -- in general, the practice is that blood is

25 drawn before transfusion.

2:21-cv-01242-BHH     Date Filed 04/11/23     Entry Number 132-1     Page 5 of 18

Aaliyah Patterson vs We Are Sharing Hope SC, et al.
Elizabeth Davies, M.D. on 09/29/2022                                    Page 16

1    A.    Correct.

2    Q.    Okay. And why did you want the blood type?

3    A.    Because I knew I was required to verify the blood
4  type with source documentation, and that source
5  documentation at that point in time was not on UNet.

6    Q.    All right. And Ms. -- and on November 26th,
7  Ms. Scholl tells you that the donor has type O blood,
8  right?

9    A.    Yes.

10   Q.    Do you know where she got that information?

11   A.    No. And I wrote, "No documentation on DonorNet."

12   Q.    Okay. Did you ask Ms. Scholl where she had
13  gotten the information of type O blood?

14   A.    No.

15   Q.    And you didn't ask her to send you any documents
16  for -- source documents for the type O blood?

17   A.    The source documentation has to be uploaded onto
18  UNet.

19   Q.    And so when you say, "No documentation on
20  DonorNet," tell me what you mean.

21   A.    I mean that the source documentation that is
22  required, two OBO -- two ABO blood types drawn at two
23  separate times that are bioidentical have to be on --
24  uploaded as an image onto DonorNet.

25   Q.    Okay. And -- and November 26th as of 10:28 p.m.,

2:21-cv-01242-BHH    Date Filed 04/11/23    Entry Number 132-1    Page 6 of 18

Aaliyah Patterson vs We Are Sharing Hope SC, et al.
Elizabeth Davies, M.D. on 09/29/2022                        Page 17

1   the ABO information had not been uploaded?

2       A.   Correct.

3       Q.   And did you ever verify that this donor's ABO was
4   compatible with Mr. Patterson's ABO?

5       A.   The -- I identified that there were two ABO blood
6   types drawn at two separate times that got uploaded to
7   UNet.  I identified that they were identical and compatible
8   with Mr. Patterson's blood type as -- as printed on the
9   electronic allocation system.

10      Q.   So you reviewed what are referred to as ABO 1 and
11  2?

12      A.   Correct.

13      Q.   You saw that those had type O?

14      A.   Drawn at two separate times with the donor ID
15  number on them.

16      Q.   And you knew that Mr. Patterson had type O blood?

17      A.   Mr. Patterson was listed in DonorNet as type O
18  blood.

19      Q.   Did you do anything else to verify that this
20  donor's ABO was compatible with Mr. Patterson?

21      A.   No.

22      Q.   And when did you verify the ABO compatibility
23  between this donor and Mr. Patterson?

24      A.   Before I left Tennessee.

25      Q.   What period of time?

2:21-cv-01242-BHH     Date Filed 04/11/23     Entry Number 132-1     Page 7 of 18

Aaliyah Patterson vs We Are Sharing Hope SC, et al.
Elizabeth Davies, M.D. on 09/29/2022                                    Page 18

1    A.  I mean, you'd have to look at the UNOS record --
2  login record, and it'll tell you when I looked at the ABO
3  after it was uploaded into UNet.
4    Q.  Did you ever review all of the donor's ABO test
5  results?
6    A.  I reviewed the ABO blood types that were uploaded
7  under ABO.
8    Q.  Did you review any other of this donor's ABO test
9  results?
10   A.  Not that I'm aware of.
11   Q.  Did you ever ask to see all of the donor's ABO
12 test results?
13   A.  No.  I look at the two ABOs that are drawn at the
14 separate times that are identical and compatible with that
15 of the recipient.
16   Q.  So should you review all the donor's available
17 ABOs test results?
18   A.  No.  That is the job of the OPO.  I am a
19 technician.
20   Q.  What do you mean by you're a technician?
21   A.  I simply go, evaluate the liver and whatever
22 organs I'm taking out, and remove them.
23   Q.  When you say "evaluate," does that include the
24 ABO?
25   A.  No.  It's called evaluating for gross

2:21-cv-01242-BHH   Date Filed 04/11/23   Entry Number 132-1   Page 8 of 18

Aaliyah Patterson vs We Are Sharing Hope SC, et al.
Elizabeth Davies, M.D. on 09/29/2022
Page 21

1   Q.   Dr. Davies, what I've just handed you marked as
2   Exhibit 2 are VRL test results for the donor in South
3   Carolina.  Are you familiar with VRL Eurofins?
4   A.   I've heard of them.  I know nothing about their
5   policies and procedures.
6   Q.   Have you ever had any reason to be concerned
7   about VRL's test results?
8   A.   It's not my job to be concerned about VRLs.  If
9   an OPO chooses to use that laboratory, I have -- that's the
10  OPO's job to be concerned about it.
11  Q.   Right.  My question was just whether you've had
12  any reason to have any concerns?
13  A.   I don't remember.
14  Q.   Have you seen these VRL test results before
15  today?
16  A.   I think they were included in some of the
17  documents sent to me.
18  Q.   Do you know when you first saw them?
19  A.   I may have reviewed them at the time of -- of my
20  review of the donor.  To be honest, I review these for my
21  own personal safety, i.e., is the donor HIV positive, which
22  I actually don't need to worry about anymore because at the
23  time there were -- the Hope Act was in place, and so HIV
24  positive donors went down a different path of allocation.
25  But my -- my primary purpose for evaluating these was to --

2:21-cv-01242-BHH     Date Filed 04/11/23     Entry Number 132-1     Page 9 of 18

Aaliyah Patterson vs We Are Sharing Hope SC, et al.
Elizabeth Davies, M.D. on 09/29/2022                                    Page 22

 1  for the safety of myself and those people I was operating
 2  with.
 3      Q.  You review the VRL test results for any reason
 4  other than your own safety?
 5      A.  No.
 6      Q.  Do you recall if you saw the VRL test results
 7  before you removed this donor's liver?
 8      A.  I don't remember.
 9      Q.  Prior to removing the donor's liver, were you
10  aware that VRL had run a ABO test on this donor?
11      A.  I don't believe so.
12      Q.  And prior to removing this donor's liver, were
13  you aware that VRL had found this donor to have an
14  indeterminate and discrepant blood type?
15      A.  I do not believe so.
16      Q.  Dr. Davies, do you believe that these VRL test
17  results should have been brought to your attention?
18      A.  It is not my job to evaluate the voracity of
19  testing.  That is the OPO's job.  I have -- I'm -- I'm not
20  even the accepting surgeon.  I am simply a technician
21  removing a liver to give it to an accepting surgeon to
22  transplant.  My job is to simply do that.  I don't have any
23  other role.
24      Q.  It's not your job to verify?
25      A.  It is my job to identify that there are two ABOS

2:21-cv-01242-BHH    Date Filed 04/11/23    Entry Number 132-1    Page 10 of 18

Aaliyah Patterson vs We Are Sharing Hope SC, et al.
Elizabeth Davies, M.D. on 09/29/2022
Page 23

1  that are drawn at two separate times that contain the UNOS
2  patient ID number and that are compatible with the -- that
3  are identical.  Those two blood types have to be identical
4  and compatible with the blood type of the recipient as
5  listed in DonorNet.
6     Q.  Would you have wanted to know that this donor had
7  been found to have an indeterminate and discrepant blood
8  type?
9     A.  I -- it's not my job.  I'm not assessing that.
10 I'm assessing tissue.  That's my job.  My job is limited in
11 scope.
12    Q.  So it would not have mattered to you if you had
13 known this donor has indeterminate blood results?
14    A.  It's not my job.  It's not my job.  My job was
15 very limited in scope.
16    Q.  If you had known that the donor had ABO test
17 results of indeterminate, would that have raised a red flag
18 for you?
19    A.  Can you repeat the question?
20    Q.  If you had known that this donor had ABO test
21 results that were indeterminate and discrepant, would that
22 have raised a red flag for you?
23    A.  If I had known this donor had discrepant ABO
24 type, I would have expected that to have been solved by the
25 OPO.

2:21-cv-01242-BHH     Date Filed 04/11/23     Entry Number 132-1     Page 11 of 18

Aaliyah Patterson vs We Are Sharing Hope SC, et al.
Elizabeth Davies, M.D. on 09/29/2022                              Page 24

1   Q.   Would you have asked the OPO if they had resolved
2   that issue?
3   A.   I probably -- I -- I -- my response would have
4   probably have been to punt it to the transplanting surgeon.
5   It's outside my -- it's outside the scope of my training.
6   Not outside the scope of my training.  It's outside the
7   scope of my job.  My job was very limited: remove the
8   organs, teach residents how to use scissors, pickups, and
9   tie knots.
10  Q.   And I understand that.  If you had known that the
11  donor in South Carolina had indeterminate test results,
12  would you have brought that to the attention of the
13  transplant surgeon?
14  A.   Depends on who the surgeon was.
15  Q.   Tell me why that matters.
16  A.   Because some surgeons wanted me involved in
17  certain thing and some didn't.
18  Q.   Did any surgeon ever tell you not to bring to
19  them concerns about a donor's blood type?
20  A.   It was never addressed.  That specific thing was
21  never addressed, that there was -- I'd never had a concern
22  about a blood type, I don't recall.
23  Q.   Dr. Davies, if you had been aware that this donor
24  was found to have blood type forward type O negative and
25  reverse is A, would that have caused you any concerns?

2:21-cv-01242-BHH    Date Filed 04/11/23    Entry Number 132-1    Page 12 of 18

Aaliyah Patterson vs We Are Sharing Hope SC, et al.
Elizabeth Davies, M.D. on 09/29/2022                                Page 25

1    A.   When I -- when I saw what happened, it did -- it
2    caused me concern.
3    Q.   And if you had been alerted to this prior to
4    removing the liver, would that have caused you any concern?
5    A.   It wouldn't have been me who was alerted.
6    Q.   I don't understand.
7    A.   It would have been the transplant surgeon.
8    There's no communication with me.  The communication is
9    between the OPO and the organ recovery coordinator and the
10   transplant surgeon.
11   Q.   Do you see your role as simply, as you say, going
12   down with the scissors, removing the liver, and getting it
13   back to Vanderbilt?
14   A.   Absolutely.
15   Q.   Okay.  If you had been told that this donor had
16   indeterminate blood results and you had been told the
17   transfusions this donor had received, would you have
18   suspected the transfusions might be responsible for the
19   indeterminate results?
20        MS. REYNOLDS:  Objection to form.
21   A.   It was outside the scope of my job.
22   BY MR. MOYLAN:
23   Q.   Were you ever told that ABO testing on this donor
24   had been run on hemodiluted blood samples?
25   A.   I was -- it was noted that the patient was

2:21-cv-01242-BHH    Date Filed 04/11/23    Entry Number 132-1    Page 13 of 18

Aaliyah Patterson vs We Are Sharing Hope SC, et al.
Elizabeth Davies, M.D. on 09/29/2022                                    Page 29

1  internet at Grand Strand?
2      A.  Absolutely not.
3      Q.  Why not?
4      A.  Because that's a violation that could jeopardize
5  their job if they allowed me to log in under their ID.
6      Q.  That's a answer to a different question.  Did you
7  ask anyone at Grand Strand if you could log into their
8  internet?
9      A.  No.
10     Q.  Did you review any of the donor's medical records
11 after you arrived in South Carolina?
12     A.  Not that I'm aware of.
13     Q.  Did you ever speak to anyone from the OPO in this
14 case?
15     A.  In the OR I would.  It would have been standard
16 for me to speak to someone in the OR.
17     Q.  How about outside of the OR?
18     A.  When?
19     Q.  At any point.
20     A.  Obviously, there were communications, none of
21 which I recall, at the OPO, and I can say that only because
22 of a text message that went back, that I saw that went
23 back.
24     Q.  Tell me what you're referring to.
25     A.  There was a text message that went back to

2:21-cv-01242-BHH    Date Filed 04/11/23    Entry Number 132-1    Page 14 of 18

Aaliyah Patterson vs We Are Sharing Hope SC, et al.
Elizabeth Davies, M.D. on 09/29/2022                                Page 45

```
 1   BY MR. MOYLAN:
 2       Q.   And, Dr. Davies, you also signed a high risk
 3   disclosure for this donor?
 4       A.   Yes.
 5       Q.   And you signed that in South Carolina?
 6       A.   Yes.
 7       Q.   And the donor was high risk because of
 8   hemodilution?
 9       A.   Correct.
10       Q.   And one purpose of that high risk disclosure is
11   to inform you what test had been completed using
12   hemodiluted specimens?
13       A.   Hemodilution applies to serology.  It's
14   hemodilution applied to serology.
15       Q.   Did you read the high risk disclosure before you
16   signed it?
17       A.   No.
18       Q.   Were you ever told what test had been completed
19   using hemodiluted specimens?
20       A.   No.
21       Q.   Did you ask anyone what test had been run using
22   hemodiluted specimens?
23       A.   No.
24       Q.   While you were at Grand Strand in South Carolina,
25   did you receive a vile of the donor's blood?
```

2:21-cv-01242-BHH   Date Filed 04/11/23   Entry Number 132-1   Page 15 of 18

Aaliyah Patterson vs We Are Sharing Hope SC, et al.
Elizabeth Davies, M.D. on 09/29/2022                                Page 47

1    Q.   And, Dr. Davies, do you print these documents
2  out, or you just look at them on the computer screen?
3    A.   Absolutely don't print them out.  Just computer
4  screen.
5    Q.   Okay.  And then at 5:21 it shows that you pulled
6  the serology NATS for this donor; is that right?
7    A.   Correct.
8    Q.   And that's one of the first documents that you
9  pull?
10   A.   Actually, it was the fifth or sixth document I
11 pulled.
12   Q.   Looks like one, two, three, four, five.  You pull
13 it within three minutes of logging onto DonorNet; is that
14 true?
15   A.   I think the order that I pull things is
16 important.  I don't look at anything until I have an
17 authorization.
18   Q.   Okay.
19   A.   Then I don't look at anything until I have a
20 death note.
21   Q.   Okay.
22   A.   And then I just start going through things.
23   Q.   And then you pull the increased risk disclosure?
24   A.   Yeah.
25   Q.   That's important that you pulled that as the

2:21-cv-01242-BHH    Date Filed 04/11/23    Entry Number 132-1    Page 16 of 18

Aaliyah Patterson vs We Are Sharing Hope SC, et al.
Elizabeth Davies, M.D. on 09/29/2022    Page 48

1   third document?
2       A.  It's just once I -- once I know I have the
3   authority to look at it, i.e., there's a consent and that
4   the patient is brain dead, if either of those documents had
5   not been appropriate I would go no further.  Then I just
6   start clicking through the tabs.
7       Q.  Okay.  At the time that you pulled this serology,
8   the serology report on November 26 at 5:21, you'd not seen
9   any source document for the donor's blood type, right?
10      A.  Correct.
11      Q.  And the serology NATS, these are -- include the
12  VRL results that we looked at earlier, right?
13          MS. REYNOLDS:  Objection to form.
14      A.  My purpose for looking at this document five and
15  a half hours before the organ is accepted is simply to
16  start to plan my life.  It's all about logistics.
17  BY MR. MOYLAN:
18      Q.  Again, my question is, I think, pretty
19  straightforward.  These serology NATS include the VRL
20  results we looked at earlier?
21          MS. REYNOLDS:  Objection to form.
22      A.  My purpose was not to evaluate the testing.
23  BY MR. MOYLAN:
24      Q.  I'm not asking about your purpose.  I'm simply
25  asking: do these serology results contain the VRL results?

2:21-cv-01242-BHH   Date Filed 04/11/23   Entry Number 132-1   Page 17 of 18

Aaliyah Patterson vs We Are Sharing Hope SC, et al.
Elizabeth Davies, M.D. on 09/29/2022                    Page 52

1   Q.  Do you know if -- did you review the serology
2   NATS that you opened at 17:21 for more than one minute
3   prior to opening the hemodilution results?
4   A.  I would have reviewed the serology NATS simply to
5   see if they were present.  My purpose of going into the
6   DonorNet at this point is to see the likelihood of whether
7   I'm going out that night.  So, in general, NATS can take up
8   to eight hours.  So if there's no NATS present, I know I'm
9   probably going to sleep.
10      My whole purpose at this point is to figure out
11  can I go to the grocery store, can my resident go to lunch,
12  do I need to walk the dog, do I have to call the dog
13  sitter.  That's my purpose five hours before wherever.  And
14  I can tell you I probably looked at every chart in UNet.
15      I just -- I'm trying to take a life that is
16  completely unpredictable and -- and be able to organize it
17  in a four-hour block.  And so my purpose for going through
18  this is -- is -- which is why you see me clicking through
19  things relatively quickly is I'm just trying to see what's
20  the chances of, one, we getting this liver or kidneys or
21  pancreas, and trying to make a prediction when I'm going to
22  go.  I'm just trying to organize my life.  That's the
23  purpose of this evaluation.
24  Q.  Okay.  And the serology NATS are the ones I think
25  you told me that you review primarily for your own safety?

2:21-cv-01242-BHH    Date Filed 04/11/23    Entry Number 132-1    Page 18 of 18

Aaliyah Patterson vs We Are Sharing Hope SC, et al.
Elizabeth Davies, M.D. on 09/29/2022                                      Page 53

1     A.   Yes.

2     Q.   Just a few quick questions on some of these,

3  Dr. Davies.

4          MR. MOYLAN:  Showing the witness what's been

5     marked as Wash 176.

6          (Plaintiff's Exhibit No. 7 was marked for

7          identification.)

8  BY MR. MOYLAN:

9     Q.   And, Dr. Davies, I'm going to ask you about the

10 entry on 6:14, about halfway down the page.  It just says

11 "0546 Dr. Davies from the liver team sent text that they've

12 landed."  5:46 a.m., you think that accurately reflects

13 when you landed in South Carolina?

14    A.   I have no idea.

15    Q.   Okay.  Dr. Davies, one of the documents indicates

16 that you travel with a team of three.  Do you know who the

17 three people were?

18    A.   I would have probably had a resident, and I might

19 have had a medical student.  I don't know who the third

20 person was since this was a visiting OPO -- I was a

21 visiting OPO.

22         MR. MOYLAN:  I'm going to show the witness what's

23    been marked as Wash 1306.

24         (Plaintiff's Exhibit No. 8 was marked for

25         identification.)