# EXHIBIT 7

# Deposition Excerpts of Darla Welker

Page 1

1   STATE OF SOUTH CAROLINA        COURT OF COMMON PLEAS
2   COUNTY OF CHARLESTON           9TH JUDICIAL CIRCUIT
3   MICHELLE CHA HOLLIMAN, individually and as personal
    representative of the Estate of Allen B. Holliman,
4
            Plaintiff,
5
            vs.            CASE NO. 2020-CP-10-2902
6
    WE ARE SHARING HOPE SC, MEDICAL UNIVERSITY OF SOUTH
7   CAROLINA, and UNITED NETWORK FOR ORGAN SHARING,
8           Defendants.
9
10  VIDEOCONFERENCE
    DEPOSITION OF:      DARLA A. WELKER
11
    DATE:               December 14, 2020
12
    TIME:               10:04 a.m.
13
    LOCATION:           Mount Pleasant, South Carolina
14
    TAKEN BY:           Counsel for the Plaintiff
15
    REPORTED BY:        MARIE H. BRUEGGER, RPR, CRR
16                      (Appearing Via VTC)
    _____
17
18
19
20
21
22
23
24
25

2:21-cv-01242-BHH   Date Filed 04/11/23   Entry Number 137-7   Page 3 of 8
Darla A. Welker December 14, 2020
Holliman, Michelle v. We Are Sharing Hope SC, et al

Page 45

1    that the donor received blood transfusions,
2    correct?
3             MS. CRAIG:  Same objection.
4             THE WITNESS:  Any coordinator that was
5    on site to review the case, yes, would have known
6    that, should have known that.
7    BY MS. DINKINS:
8        Q    Were there any other coordinators on
9    site for this donor who should have known that?
10       A    There were.  There had to have been
11   other coordinators.  I don't recall who was on the
12   case from the start before Michael.
13       Q    Were you responsible for approving the
14   blood type reported for this donor?
15       A    Yes.
16       Q    And so did you approve reporting this
17   donor as having blood type O?
18       A    I did.
19       Q    How did you communicate your approval
20   of this donor's blood type?
21       A    How did we verify?  Is that the
22   question?
23       Q    Well, my first question was a little
24   more technical.  How did you communicate it?  So
25   did you do this over writing?  Over the phone?

Page 50

1    and --
2          Q    And what -- excuse me.
3          A    And hemodiluted is clotted, so it
4    could be a bad sample that was drawn.  I didn't
5    know at the time.
6          Q    Did you look into why the VRL results
7    were indeterminate?
8          A    No, not after we found --
9          Q    Why not?
10         A    Not after we found two samples that
11   were both resulted as an O from the hospital.
12         Q    Do you think you should have looked
13   into why the VRL results came back indeterminate?
14              MS. CRAIG:  Objection.
15              THE WITNESS:  Perhaps in hindsight,
16   yes.
17   BY MS. DINKINS:
18         Q    What can cause blood samples to be
19   hemodiluted?
20         A    Depends on -- if the patient is
21   coagulopathic at the time, the sample can clot.
22         Q    What does that mean, to be
23   coagulopathic?
24         A    That means the patient is clotting too
25   fast.  Their blood is clotting fast.

1    an active case, so then the medical director
2    should be reviewing that record if it's an active
3    donor.
4         Q   So would they review the records from
5    the donor's last hospital stay?
6         A   If there is concern for anything, yes,
7    they would.
8         Q   But would they -- what about if
9    there's not particular concern, would the records
10   from the last hospital stay be reviewed by the
11   medical director?
12        A   Are you meaning a previous stay to
13   that admission?
14        Q   I'm meaning from the donor's last
15   hospital stay.
16        A   So you're meaning the current stay
17   that they're at, the reason they're at the
18   hospital?
19        Q   That's right.
20        A   Okay.  So yes, yes, they should be
21   reviewing that, yes.
22        Q   And does the medical director review
23   all of the lab results for a donor?
24        A   I mean, that's their role.  I can't
25   speak 100 percent, but generally, yes.

2:21-cv-01242-BHH    Date Filed 04/11/23    Entry Number 137-7    Page 6 of 8
Darla A. Welker                          December 14, 2020
Holliman, Michelle v. We Are Sharing Hope SC, et al

Page 93

1             A     Yes.
2             Q     So do you believe in this case that
3     the CDC would have spoken with the blood bank and
4     reviewed the donor's records to determine whether
5     the sample was collected posttransfusion?
6                   MS. CRAIG:  Objection.  Speculation.
7                   THE WITNESS:  I don't know.  I was --
8     I would -- you would have to ask that particular
9     person.  I don't know.
10    BY MS. DINKINS:
11            Q     But is that what you would typically
12    expect to happen?
13                  MS. CRAIG:  Objection.
14                  THE WITNESS:  Normal practice.
15    BY MS. DINKINS:
16            Q     Do you have any reason to believe that
17    the normal practice wasn't followed here?
18                  MS. CRAIG:  Same objection.
19                  THE WITNESS:  No, I don't.
20    BY MS. DINKINS:
21            Q     What blood type does this report
22    indicate for the donor?
23            A     It's indeterminate, meaning they
24    cannot determine the blood type.
25            Q     And what do the comments underneath

2:21-cv-01242-BHH    Date Filed 04/11/23    Entry Number 137-7    Page 7 of 8
Darla A. Welker
December 14, 2020
Holliman, Michelle v. We Are Sharing Hope SC, et al

Page 94

1    the indeterminate result mean?
2         A    I'm not 100 percent certain because
3    I'm not a blood specialist.  I just know that it
4    means they can't determine a blood type.
5         Q    Would anyone working on this donor's
6    case have known what those comments mean?
7              MS. CRAIG:  Objection.
8              THE WITNESS:  It would have been just
9    that we could not determine a blood type.
10   BY MS. DINKINS:
11        Q    Right.  You just said that you didn't
12   know what the comments underneath the
13   indeterminate result mean because you're not a
14   blood specialist.  Was there anyone working on
15   this donor's case who would have fully understood
16   what these comments mean?
17             MS. CRAIG:  Object to form.
18             THE WITNESS:  At the time, no, just
19   that we could not determine a blood type based on
20   that sample.
21   BY MS. DINKINS:
22        Q    If you'll please look at Exhibit 3,
23   which is WASH 322.
24        A    0322?
25        Q    Yes.

1   that's reported on this form for ABO 1 and ABO 2
2   does not match the blood typing results from the
3   VRL reports, does it?
4       A   I'm sorry.  Just one second.  I
5   thought I was plugged in.  My iPad looks like it's
6   about to die.
7       Q   No problem.
8       A   So that ABO 1 and ABO 2 are the two
9   hospital ABOs, not the VRL ABOs.
10      Q   Do the ABO 1 and the ABO 2 results, do
11  they match the results from the VRL reports?
12      A   No.
13          MS. CRAIG:  Objection.
14          THE WITNESS:  That's not a report,
15  other than saying it's indeterminate.  It cannot
16  be determined.  So it's not a blood type reporting
17  as in a type.
18  BY MS. DINKINS:
19      Q   It's just -- it's an indeterminate
20  result, correct?
21      A   Correct.
22      Q   And so VRL did not report the same
23  blood type as the hospital ABOs, did it?
24      A   Correct.
25          (Plaintiff's Exhibit 4,